Carolyn LANGLEY, Alberta Succaw, Shirley Furtick, and Celeste Cleckley, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Thomas COUGHLIN, Commissioner of the New York State Department of Correctional Services, et al., Defendants.

Corean EVANS, Plaintiff,

v.

Thomas COUGHLIN, N.Y.S. Department of Correctional Services, et al., Defendants.

Nos. 84 CIV. 5431 (LBS), 83 CIV. 7172 (LBS).

United States District Court, S.D. New York.

June 8, 1989.

Koob, Magoolaghan & Salzman, New York City (Joan Magoolaghan, Elizabeth L. Koob, of counsel), for plaintiffs-Class.

Prisoners Legal Services New York City (Ruth Cassell, of counsel), for plaintiffs-intervenor.

Robert Abrams, Atty. Gen., State of N.Y., New York City (William K. Sanders, Judith Gordon, Asst. Attys. Gen., of counsel), for all defendants except Klug.

Singleton, Keegan & Spolzino, Mount Kisco, N.Y. (Robert A. Spolzino, of counsel), for defendant Robert Klug.

## OPINION

SAND, District Judge.

By Order dated January 23, 1989, this Court expanded the scope of its earlier reference to Magistrate Dolinger to "include all pretrial matters including, but not limited to, questions of class definition and certification, except that questions relating to defendants' immunity are not included in this reference." On March 31, 1989, this Court denied defendants' motions for summary judgment based on the defense of qualified immunity, 709 F.Supp. 482 (1989). On April 21, 1989, Magistrate Dolinger filed a Report and Recommendation ("Report") (Appendix A, hereto) dealing with all other matters raised by the pending motions except as noted.[1] The case is now before the Court on the parties' objections to the Report.

*Correctional Service Defendants' Objections*

Initially, defendants Coughlin, Lord and Duncan object that the Magistrate's Report exceeded the scope of the reference to him and that it was their understanding that his Report would be limited to class decertification and class definition issues on the grounds that all other matters dealt with by the Magistrate relate to the issue of immunity excluded from the reference.

---

1. *See* Report at 6, n. 5, 96 n. 49.

The Magistrate clearly understood and acted within the scope of the reference.

Of course, there is an intermeshing between the immunity issues and other questions in the case. But there is no significant inconsistency between the Magistrate's Report and this Court's March 31, 1989 Opinion denying the motion for summary judgment. The claims of inconsistency relate to matters that this Court left open for possible revisiting and that defendants assert the Magistrate foreclosed. These contentions lose sight of the fact that both this Court's Opinion and the Magistrate's Report are denials of summary judgment. If the factual development of the case as it evolves furnishes a good faith basis for asserting that the premises upon which those denials were predicated are not valid, *e.g.,* if the Court (which will be the fact finder in these proceedings) concludes that plaintiffs' damage claims do not involve any constitutional rights, defendants may ask that the immunity issue be reexamined. Indeed, in such an event, the § 1983 claims would fail and only state law issues would remain. A re-examination by the Court of its role in such a controversy would be entirely appropriate.

Suffice it to say, on the record as presented at the time these motions were made, the March 31, 1989 Opinion of this Court and the April 21, 1989 Magistrate's Report are consistent, harmonious, and provide adequate ground rules for the future conduct of this vexatious litigation.

■ Correctional defendants assert that the Magistrate has erroneously placed the burden of proof on them on the issue of class certification. They claim that the burden should properly rest with the plaintiffs since plaintiffs are now, for the first time, asserting a new class and subclasses and a new theory for certification. We find it unnecessary to resolve this question (which the Magistrate characterized as "doubtful," Report at 60) because we are satisfied that plaintiffs would prevail on the class certification issue even if it were entirely their burden to sustain such certification *de novo.*

### Plaintiffs' Objections

■ Plaintiffs object to the Magistrate's exclusion from the class of those inmates who were placed in Building 118 for purposes of protective custody rather than for disciplinary infractions. Plaintiffs urge that "Building 118" and "SHU" were used interchangeably and synonymously for many purposes in this litigation and for purposes of the monitoring pursuant to the settlement of the injunctive aspects of this case. But plaintiffs fail to address their concession that, were such inmates included, there would be need for a fourth subclass which they have never sought and for which they have no such class representative (Report, at 90). Indeed, plaintiffs still do not seek a fourth subclass: "Plaintiffs respectfully request the Court's adoption of the Magistrate's findings and recommendations accepting plaintiffs' definition of three subclasses." Plaintiffs' Response to the Report and Recommendation of the Magistrate at 37 (Apr. 21, 1989). We adopt the Magistrate's definition of the scope of the class, including the three subclasses, and the August 31, 1981 commencement date.[2]

### Defendant Klug's Objections

Defendant Klug urges that the Magistrate's Report is erroneous particularly because plaintiffs have not asserted a "conditions" claim against him. But plaintiffs have asserted a "treatment" claim against Dr. Klug and we see no error in the Magistrate's reasoning and conclusion denying summary judgment to Dr. Klug.

---

**2.** Plaintiffs have consistently used an August 31, 1981 commencement date although the complaint was filed on July 31, 1984 and the three year statute of limitations would enable pursuit of claims as early as July 31, 1981 (Report at 63–64). Plaintiffs now seek to modify the class to include this additional month urging that this would neither surprise nor unduly burden de-

fendants. Plaintiffs' Response, at 20. We are in no position to evaluate the practical consequences of adding an additional month to the class, but we see no reason, in a case now pending for almost five years, to modify the commencement date which has been used throughout the litigation. Plaintiffs' request is denied.

■ Dr. Klug argues that plaintiffs have introduced evidence as to only eighteen of the 250 class members and that summary judgment should therefore be granted as to the remaining 232 class members. This claim misconceives the difference between a motion for summary judgment in a class action and the trial itself. We adopt the Magistrate's Report in this regard.

### Miscellaneous Matters

The parties are to take up with the Magistrate the details concerning class notice. *See* Report at 96, n. 48.

Correctional defendants point out (Correctional Defendants' Objections, at 19, n. 7) that N.Y.Pub.Off.Law § 17(3)(c) (McKinney 1988) was amended in 1986 to delete the clause that specifically excluded indemnification for "punitive or exemplary damages." Historical Notes to N.Y.Pub. Off.Law § 17 (McKinney 1988). The law now excludes indemnification of intentional wrongdoing, fines and penalties but does not exclude indemnification of "deliberate indifference" claims. No change in the Magistrate's Report is occasioned by this correction.

### CONCLUSION

We have considered and find to be without merit the other objections raised by the parties. The Report and Recommendation is adopted.

SO ORDERED.

### APPENDIX A

### REPORT AND RECOMMENDATION

TO THE HONORABLE LEONARD B. SAND, U.S.D.J.:

This class-action prisoner lawsuit was commenced in 1984 to seek relief from certain allegedly unconstitutional conditions and practices on the Special Housing Unit ("SHU") at the Bedford Hills Correctional Facility.[1] Plaintiffs allege principally that until September 1987[2] New York State Correction Department officials routinely placed severely mentally ill inmates on SHU and that in so doing they failed to conduct any screening of these inmates, failed to provide even marginally adequate treatment for their mental condition while they were on SHU, and failed to protect the other inmates on SHU from the conditions that resulted from the presence of these disturbed inmates—including filth, noisome odors, deafening noise, fire and smoke, and the sight and sound of prisoners engaging in such psychotic behavior as attempted suicide, self-mutilation and hallucination. According to plaintiffs, these failings reflected a violation of the jailers' obligations (a) to provide medical care for the serious medical needs of the disturbed inmates and (b) to ensure that living conditions on SHU not fall below constitutionally permissible standards for all inmates on that unit.

Following the certification of a class under Fed.R.Civ.P. 23(b)(1)(A) and 23(b)(2) in December 1985, and the settlement of plaintiff's injunctive claims in July 1987, the parties commenced discovery concerning plaintiff's demand for compensatory and punitive damages. During the later phase of this discovery, defendants moved for summary judgment on the merits and on the basis of qualified immunity or for dismissal based on Eleventh Amendment immunity. Alternatively they seek decertification of the class for purposes of any trial on damages. In addition, the New York State Office of Mental Health seeks dismissal of a cross-claim asserted against it by one of the individual defendants, Dr. Ronald Klug.

For the reasons that follow, I recommend that the motions for summary judgment or dismissal be denied except with respect to

---

1. In 1983 a single inmate, Ms. Corean Evans, filed suit in this Court challenging some of the same conditions at Bedford Hills SHU. Her complaint did not seek class certification, and her case has since been consolidated with the *Langley* action.

2. The parties settled the injunctive claims by stipulation executed in July 1987 and approved

Dr. Klug's cross-claim.[3] As for the class, I recommend that it be recertified as a Rule 23(b)(3) class, with appropriate notice to be provided to the putative members.

PROCEDURAL HISTORY

In its original form plaintiffs' complaint was not styled as a class suit, but it sought both injunctive relief and damages based upon the asserted continuing violation of the Eighth Amendment rights of SHU inmates. The complaint named as defendants Thomas Coughlin, III, the Commissioner of Correctional Services; Frank Headley, the Superintendent of Bedford Hills; Elaine Lord, the Deputy Superintendent; Dr. James Prevost, the Commissioner of the New York State Department of Mental Hygiene; Dr. Ronald J. Klug, the Unit Chief of the Mental Hygiene Unit at Bedford Hills; a Lieutenant George Duncan, who was assigned to supervise security at the Bedford Hills SHU; and various other officials and corrections officers assigned to Bedford Hills. All of these defendants were named in both their official and individual capacities, a dual status that reflected the fact that plaintiffs were seeking both injunctive and monetary relief. Subsequently plaintiffs prepared an amended complaint that mirrored the factual allegations of the original pleading and incorporated class action allegations.[4]

Plaintiffs moved in 1985 for class certification, and the Court granted that motion by order dated December 23, 1985. Since the predominant relief then sought by plaintiffs was injunctive in nature, the class was certified under Fed.R.Civ.P. 23(b)(1)(A) and (b)(2). The order defined the class as encompassing "every NYS prisoner who resided on the disciplinary segregation Special Housing Unit, Unit 118[,] Bedford Hills . . . at any time between January 1, 1983 to date."

In March 1986 plaintiffs moved for a preliminary injunction. The Court thereafter ordered that plaintiffs' applications for preliminary and permanent injunctive relief be tried at a consolidated hearing and that the damage claims be severed. The injunction hearing apparently served as a catalyst for the parties to settle all injunctive issues in the case. By twin stipulations dated July 23, 1987, between plaintiffs and both the New York State Office of Mental Health ("OMH") and the New York State Department of Correctional Services ("DOCS"), it was agreed that OMH and DOCS would take specified steps to increase the availability and quality of mental health care for SHU inmates, including the provision of qualified OMH personnel at SHU itself, improved record-keeping, training for DOCS personnel assigned to SHU with respect to mental health problems of the SHU inmates, the prompt preparation of a mental health evaluation for all inmates placed on SHU with recommendations for treatment as needed and follow-up review as to the appropriateness of removal from SHU for the purpose of treatment. In addition, the stipulations provided for the appointment of a supervising "psychiatric expert" to monitor defendants' compliance with the terms of the stipulation for a minimum period of two years and required periodic reports to the Court by the expert. The agreement also invoked the continuing jurisdiction of the Court for a minimum of two years and authorized plaintiffs to seek relief there in the event of non-compliance by defendants with their obligations under the settlement.

Following the approval of these stipulations, the parties began to conduct sporadic discovery with respect to the remaining question of plaintiffs' entitlement to damages. This process was given particular impetus when the Court, in the late fall of 1988, set a trial date of January 30, 1989. This announcement substantially increased the level of discovery activity, and also led

___

by the Court on August 20, 1987.

3. Insofar as defendants' motions invoked a qualified immunity defense, the District Court reserved that issue for its own consideration and issued an opinion on March 31, 1989 denying the motion.

4. The amended complaint was apparently served in 1985, but the docket sheet does not reflect that it was separately filed.

to the filing of defendants' motions for summary judgment, dismissal or decertification of the class.[5] In the wake of these motions, the Court adjourned the trial date to May 1, 1989 and, except with respect to issues of qualified immunity, referred the motions to me for a report and recommendation.

Additional briefing has since been received from the parties, and oral argument was conducted on February 17, 1989. Although discovery has not yet been completed, the record is sufficient to permit me to address the merits of all issues raised by the parties.

ANALYSIS

The present posture of the case is that the plaintiffs, on behalf of a proposed revised class of all inmates who lived in Building 118 of the Bedford Hills Correctional Facility from August 31, 1981 through August 20, 1987 now seek compensatory and punitive damages from five individual defendants, Commissioner Coughlin, Superintendent Lord, former Superintendent Headley, Dr. Klug, and now-Captain Duncan.[6] The basis for these demands is plaintiffs' contention that defendants carried out policies or practices that resulted in the routine placement of severely mentally disturbed inmates on SHU with no thought to whether such placement would exacerbate the mental disorders of these inmates, a systemic failure to supply proper treatment for SHU inmates with mental problems and a lack of any effort to protect the inmate housed on SHU from the effects of housing seriously disturbed inmates on the same unit. According to plaintiffs, this approach to prison discipline created conditions of confinement on SHU that were so deplorable as to violate the Eighth Amendment strictures against cruel and unusual punishment, and at the same time involved such an egregious failure to address the serious medical needs of the disturbed inmates as to constitute constitutionally impermissible "deliberate indifference" under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Defendants' motions attack the factual premises for plaintiffs' claims.[7] Specifically, they argue that there is insufficient evidence to sustain either the claim that plaintiffs' constitutional rights were violated or the assertion that the moving defendants[8] were responsible for such violations. They also claim that the Eleventh Amendment bars recovery. Defendants alternatively challenge the appropriateness of class treatment of plaintiffs' claims, asserting that those claims depend crucially upon proof of the individual circumstances of each inmate housed on SHU during the relevant time period.

At the outset I address the constitutional issues and then turn to the class question.

I. *The Summary Judgment Motions*

A. General Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure permits the court to enter summary judgment only if it finds that there is no dispute as to any material fact and that, based on these undisputed facts, the moving party is entitled to judgment as a matter of law. *See, e.g., Montana v. First Federal Savings & Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 57 (2d Cir.1985). It is

---

**5.** By separate motion, defendant Frank Headley seeks dismissal pursuant to Fed.R.Civ.P. 4(j) based on plaintiffs' assertedly untimely service of process on him. That motion will be addressed in a separate Report and Recommendation.

**6.** As originally certified, the class encompassed all inmates who lived on SHU—which is housed in Building 118—from January 1, 1983 "to date." (*See* Order dated December 23, 1985.)

**7.** The State Attorney General has filed a consolidated motion on behalf of defendants Coughlin, Lord and Duncan. Defendant Klug, who is separately represented, seeks equivalent relief by a separate motion.

**8.** Defendant Headley has not joined in the current summary judgment motions.

axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Ins. Co.*, 804 F.2d at 11; *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* ─── U.S. ───, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). *See, e.g., Montana, supra,* at 103–104; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

The movant bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant is not required, however, to proffer evidence negating the elements of its adversary's case; thus, if the opposing party would bear the burden of proof at trial, the movant need not offer evidence to disprove the other side's claims. *Id.*

Once the movant has carried his initial burden, the party opposing the motion bears the burden of showing that there is in fact a genuine dispute as to one or more of the material facts. *Id. See also Greater Buffalo Press, Inc. v. Federal Reserve Bank,* 866 F.2d 38, 42 (2d Cir.1989). In so doing, he cannot simply rely on his pleadings or on conclusory allegations or conjecture as to the facts, but rather must present specific evidence in support of his contention that there is a genuine dispute as to the facts. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553; *Montana,* at 103; *Knight v. U.S. Fire Ins. Co., supra,* 804 F.2d at 12; *L & L Started Pullets, Inc. v. Gourdine,* 762 F.2d 1, 3–4 (2d Cir.1985); *Eastway Constr. Corp. v. City of New York, supra,* 762 F.2d at 251.

To demonstrate that there is a "genuine dispute," the party opposing summary judgment must come forward with enough evidence to justify a reasonable jury in returning a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Cinema North Corp. v. Plaza at Latham Associates,* 867 F.2d 135, 138 (2d Cir.1989). Thus, the party that bears the burden of proof cannot meet its burden on the motion by adducing evidence that is "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. *See, e.g., Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 865 F.2d 492, 493 (2d Cir.1989) (*per curiam*). In effect, the Court must apply the same standard as it would utilize under Fed.R.Civ.P. 50(a) in deciding a motion for a directed verdict at trial, and therefore must enter summary judgment if there can be only one reasonable conclusion based on the evidence adduced. *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 250, 106 S.Ct. at 2511 (citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)). *See, e.g., Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989).

Bearing these standards in mind, I turn to the substantive issues on which defendants seek summary judgment.

### B. The Plaintiffs' Claims

As noted, plaintiffs' legal theories rests on two related contentions, both stemming from the asserted failure of defendants adequately to address the psychiatric needs of mentally disordered inmates assigned to SHU. According to plaintiffs, the decision to place severely disturbed inmates on SHU without prior consideration of whether such placement was medically appropriate for them and the subsequent systematic failure to address the psychiatric needs both of these inmates and of other inmates on SHU who suffered from significant mental problems while on this unit amounted to a violation of those inmates' right to treatment. In addition, the result of leaving those inmates on SHU without proper

medical care was that the conditions of confinement for all SHU inmates failed to meet minimum Eighth Amendment standards.

Defendants' challenges to these claims are twofold. First, they assert that the procedures utilized at Bedford Hills did not violate plaintiffs' rights. Second, they assert that in any event they did not bear any direct responsibility for these alleged failings, and thus they cannot be held liable for them. In addition, as a separate matter they seek summary judgment with respect to plaintiffs' prayer for punitive damages.

### 1. Failure to Treat

The constitutional obligation of the state to meet certain minimum standards of medical care for individuals held in custody is traceable to both the Eighth Amendment prohibition against "cruel and unusual punishment," see, e.g., Estelle v. Gamble, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed. 2d 251 (1976), and the Fourteenth Amendment guarantee of due process. See, e.g., Youngberg v. Romeo, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). See also DeShaney v. Winnebago County Dep't of Social Services, — U.S. —, 109 S.Ct. 998, 1004–05, 103 L.Ed.2d 249 (1989). Although the applicable standards under these two provisions have been somewhat differently articulated, they reflect a common concern for ensuring at least minimally adequate medical care for individuals confined against their will.

■ We start with the recognition that prison officials are traditionally accorded substantial deference in administering the internal affairs of their prisons, see, e.g., Bell v. Wolfish, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); Hutto v. Finney, 437 U.S. 678, 687 n. 9, 98 S.Ct. 2565, 2572 n. 9, 57 L.Ed.2d 522 (1978); Preiser v. Rodriguez, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973), including the medical care that they provide. See generally Dean v. Coughlin, 804 F.2d 207, 213–15 (2d Cir.1986). Nonetheless, when the state confines an individual against his will, it assumes an obligation to provide for his basic needs, see, e.g., DeShaney, supra, 109 S.Ct. at 1004–

05; West v. Atkins, — U.S. —, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988) (discussing Estelle v. Gamble); Youngberg v. Romeo, supra, 457 U.S. at 324, 102 S.Ct. at 2462, and the extent of that obligation is, in general terms, defined by decisional authority under both the Eighth and the Fourteenth Amendments.

The "cruel and unusual punishment" provision of the Eighth Amendment was designed principally to protect against such extreme conduct as " 'torture[s]' and other 'barbar[ous]' methods of punishment." Estelle v. Gamble, supra, 429 U.S. at 102, 97 S.Ct. at 290 (quoting Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif.L.Rev. 839, 842 (1969)). See also Davidson v. Cannon, 474 U.S. 344, 354 n. 3, 106 S.Ct. 668, 673 n. 3, 88 L.Ed.2d 677 (1986) (Blackmun, J., dissenting). Thus in most Eighth Amendment cases, as Judge Friendly noted in Johnson v. Glick, "[t]he [common] thread ... is that 'punishment' has been deliberately administered for a penal or disciplinary purpose, with the apparent authorization of high prison officials charged by the state with responsibility for care, control, and discipline of prisoners." 481 F.2d 1028, 1032 (2d Cir.), cert. denied sub nom. Employee–Officer John v. Johnson, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

■ This focus on punitive intent does not, however, describe the full reach of the provision, which also offers some protection against the unjustified failure of the state to provide basic services to the prisoners, even if not for a punitive purpose. In Estelle v. Gamble, supra, 429 U.S. at 104, 97 S.Ct. at 291, the Supreme Court defined the obligation of the State to provide medical care by holding that "deliberate indifference to serious medical needs of prisoners" would constitute a violation of the Eighth Amendment. See, e.g., West v. Atkins, supra, 108 S.Ct. at 2255; Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986); Archer v. Dutcher, 733 F.2d 14, 15 (2d Cir.1984).

■ Although this standard is not one that can be applied with geometric

precision, its outer limits can be discerned with reasonable clarity. On the other hand, an isolated and inadvertent error in treating even a serious medical need would not constitute a violation since the Eighth Amendment does not constitutionalize the law of medical malpractice. *See, e.g., Estelle v. Gamble, supra,* 429 U.S. at 105–06, ·97 S.Ct. at 291–92; *Archer v. Dutcher, supra,* 733 F.2d at 17 (Bonsal, J., dissenting); *cf. Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1245 (2d Cir.1984). On the other hand, a serious failure to provide needed medical attention when the defendants are fully aware of that need could well constitute deliberate indifference, even if they did not act with a punitive intent. *See, e.g., Doe v. New York City Dep't of Social Services,* 649 F.2d 134, 144–45 (2d Cir.1981) (test is indifference, not intent to harm), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).[9] *See also Bass v. Jackson, supra,* 790 F.2d at 262–63 (noting that claim can be established by showing "an evil intent, or recklessness, *or at least deliberate indifference* to the consequences of [defendant's] conduct for those under his control and dependent upon him.") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir. 1985); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)) (emphasis added).[10]

Since the minimum test is one of indifference rather than intent, *see Doe v. New York City Dep't of Social Services, supra,* 649 F.2d at 144, the courts have repeatedly noted that while one isolated failure to treat, without more, is ordinarily not actionable, it may in fact rise to the level of a constitutional violation if the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment. *See, e.g., Gill v. Mooney,*

*supra,* 824 F.2d at 196. Moreover, the inference of such indifference may be based upon proof of a series of individual failures by the prison to provide adequate medical care even if each such failure—viewed in isolation—might amount only to simple negligence. *See, e.g., Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977); *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974). As the Court noted in *Todaro:*

> [W]hile a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. Indeed, it is well-settled in this circuit that "a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners."

*Todaro v. Ward, supra,* 565 F.2d at 52 (quoting *Bishop v. Stoneman, supra,* 508 F.2d at 1226).

The alternative substantive due process standard has been similarly interpreted in this Circuit in the context of prisoners' claims based on their guardians' alleged misconduct. Such claims are, at least in principle, governed by the "shock the conscience" test enunciated in *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). *See Johnson v. Glick, supra,* 481 F.2d at 1032–33. As further elaborated by Judge Friendly in addressing a claim of assault by a prison guard, this somewhat amorphous test does not constitutionalize ordinary tort law:

> While the *Rochin* test, "conduct that shocks the conscience," 342 U.S. at 172, 72 S.Ct. 205, 209, is not one that can be

---

**9.** Obviously proof of a punitive intent would suffice to meet the constitutional test. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1988); *Archer v. Dutcher, supra,* 733 F.2d at 16.

**10.** Although the Court in *Bass* appears to be addressing the standard under a due process analysis, the Second Circuit has generally not distinguished between the Eighth and Fourteenth Amendments in evaluating the deliberate indifference standard. *See, e.g., Doe v. New*

*York City Dep't of Social Services, supra,* 649 F.2d at 141–45. *See also Davidson v. O'Lone,* 752 F.2d 817, 829 n. 9 (3d Cir.1984) (*en banc*) (citing cases), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). *But see West v. Atkins, supra,* 108 S.Ct. at 2260 (Scalia, J., concurring) (suggesting that only due process clause applies to a physician's failure to render treatment).

applied by a computer, it at least points the way. Certainly the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery ...; still less is it as extensive as that afforded by the common law tort actions for assault.

*Id.* at 1033 (footnote omitted).

This view has been explicitly adopted by the Supreme Court, which has held in recent decisions that, whatever its scope, substantive due process does not extend to negligent conduct by prison guards or officials. *See Davidson v. Cannon, supra,* 474 U.S. at 347–48, 106 S.Ct. at 670; *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986). *Accord, O'Neill v. Krzeminski,* 839 F.2d 9, 11 n. 1 (2d Cir.1988). In so holding, the Court found it unnecessary to decide "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Daniels v. Williams, supra,* 474 U.S. at 334 n. 3, 106 S.Ct. at 667 n. 3. *See also City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 1204 n. 8, 103 L.Ed.2d 412 (1989).

Although it could be argued that the due process clause permits a more searching review of the alleged misdeeds of prison employees and officials than does the Eighth Amendment, *see, e.g., Davidson v. Cannon, supra,* 474 U.S. at 354 n. 3, 106 S.Ct. at 673 n. 3 (Blackmun, J., dissenting) (suggesting more liberal due process standard because "the concerns underlying the Due Process Clause are broader than those underlying the Eighth Amendment ..."); *West v. Atkins, supra,* 108 S.Ct. at 2260 (Scalia, J., concurring); *Johnson v. Glick, supra,* 481 F.2d at 1032–33, the Supreme Court and Second Circuit have made no such distinction in recent decisions. In-

stead, in cases subsequent to *Daniels* and *Davidson,* they have indicated that a plaintiff inmate must establish, on the part of the prison official, "an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent on him." *Bass v. Jackson, supra,* 790 F.2d at 262–63 (quoting *Ayers v. Coughlin, supra,* 780 F.2d at 209, and *Williams v. Vincent, supra,* 508 F.2d at 546). *See, e.g., DeShaney v. Winnebago County Dep't of Social Services,* — U.S. —, 109 S.Ct. 998, 1005 & n. 5, 103 L.Ed.2d 249 (1989) (citing *Whitley v. Albers,* 475 U.S. 312, 326–27, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)). This due process standard appears to be identical to the Eighth Amendment test for denial of medical care, which, as noted, requires at a minimum a showing of "deliberate indifference." *Bass v. Jackson, supra,* 790 F.2d at 263 (citing *Estelle v. Gamble, supra,* 429 U.S. at 105, 97 S.Ct. at 291). *Accord, Whitley v. Albers, supra,* 475 U.S. at 326–27, 106 S.Ct. at 1088; *Gill v. Mooney, supra,* 824 F.2d 192, 195 (2d Cir.1987). *Cf. City of Canton v. Harris, supra,* 109 S.Ct. at 1204 (municipal liability under due process clause for failure to provide medical care must be premised on "deliberate indifference").[11]

In determining whether a party is guilty of deliberate indifference under a due process analysis—as under the Eighth Amendment—we are instructed by the Second Circuit that "a pattern of omissions" may permit the inference of such "deliberate unconcern for plaintiffs' welfare," *Doe v. New York City Dep't of Social Services, supra,* 649 F.2d at 145, and that evidence of "gross negligence"—although not equivalent to "deliberate indifference"[12]—"creates a strong presumption of deliberate indifference." *Id.* at 143 (citing cases).[13]

---

**11.** On occasion the Second Circuit has appeared to use the terms "gross negligence" and "deliberate indifference" as equivalents. *See, e.g., Villante v. Dep't of Corrections of City of New York,* 786 F.2d 516, 519–20, 522 (2d Cir.1986). The recent Supreme Court decision in *City of Canton v. Harris* seems to imply that "deliberate indifference" is a more rigorous standard. *See* 109 S.Ct. at 1204 & n. 7. *See also Doe v. New York*

*City Dep't of Social Services, supra,* 649 F.2d at 143.

**12.** As the Court in *Doe* observed, gross negligence and deliberate indifference are dissimilar in the sense that "[o]ne is a type of conduct, and the other a state of mind." *Id.* at 143.

**13.** The Court in *Doe* went on to note

The due process cases—while similar in these respects to the Eighth Amendment line of decisions—add a further gloss that may be helpful in analyzing the record in this case. In parsing the degree of care required of the State in providing habilitative training to persons involuntarily confined, the Court in *Youngberg v. Romeo, supra,* 457 U.S. at 321–23, 102 S.Ct. at 2461–62, addressed the standards to be applied when the individual is not claiming denial of all access to such services, but rather contends that the care provided was glaringly inadequate. *Youngberg* involved mentally retarded individuals who had been involuntarily committed, and the Court there suggested that decisions affecting habilitation, "if made by a professional," are deemed to be "presumptively valid" but can be challenged on a showing that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462.[14]

The Court in *Youngberg* did not specify whether this standard—as opposed to other aspects of its holdings—would apply to decisions regarding all forms of medical treatment and, if so, whether it would apply in all cases involving individuals involuntarily confined by the State, including convicted criminals. *See id.* at 313 n. 11, 102 S.Ct. at 2456 n. 11. Nonetheless, since *Youngberg* was decided, a number of courts have invoked its standards to adjudicate claims of denial of medical care by convicted prisoners. *See, e.g., Lewis v. New York City Dep't of Correction,* 87 Civ. 3640 (MBM), opinion at 6, 33/88 Star. Dec. 422, 427, 1988 WL 85445 (S.D.N.Y. Aug. 12, 1988), (1988 U.S.Dist. LEXIS 8845, 8); *Harding v. Kuhlmann,* 588 F.Supp. 1315, 1316 n. 6 & 1317 n. 8 (S.D.N.Y.1984),

*aff'd mem.,* 762 F.2d 990 (2d Cir.1985). *See also Santana v. Collazo,* 793 F.2d 41, 45 (1st Cir.1986) (*Youngberg* "professional judgment" analysis applied to juvenile prisoners' complaint regarding isolation); *Wells v. Franzen,* 777 F.2d 1258, 1261–62 (7th Cir.1985) (*Youngberg* analysis applied to prisoner's complaint regarding bodily restraint); *Newby v. Serviss,* 590 F.Supp. 591, 598–99 (W.D.Mich.1984) (combining *Youngberg* and *Estelle* analyses to adjudicate prisoner's claim of unsafe conditions of confinement). *Cf. Society for Good Will to Retarded Children v. Cuomo, supra,* 737 F.2d at 1245 (invoking *Estelle v. Gamble, supra,* in connection with claim of lack of adequate medical care asserted by residents of state school for the retarded). *But cf. Doe v. New York City Dep't of Social Services,* 709 F.2d 782, 790 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (questioning whether *Youngberg* applies to prison setting).

This approach is certainly defensible since the constitutional requirement that medical care be provided to convicted inmates rests in significant measure upon the same rationale as that which requires comparable care for others who are involuntarily committed. As explained by the Supreme Court in *DeShaney,* in which it equated *Youngberg* and *Estelle* for this purpose:

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and

---

14. While this presumption is at least theoretically rebuttable, the fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference. *Id.*

14. The Court also noted that in a suit for damages against a professional, the defendant could invoke a qualified immunity rule based upon proof that he was unable to satisfy "his normal professional standards because of budgetary constraints...." *Id.*

reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble*, [429 U.S. at 103–04, 97 S.Ct. at 290–91]; *Youngberg v. Romeo, supra*, [457 U.S. at 315–16, 102 S.Ct. at 2457–58]. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See *Estelle v. Gamble*, [429 U.S. at 103, 97 S.Ct. at 290] ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means. 109 S.Ct. at 1005–06. In view of this unitary theory underpinning the obligation of the state to provide appropriate care for people involuntarily in its custody, we may fairly infer that the standards by which to judge an alleged failure to provide such care should be comparable regardless of the circumstances under which the individual is involuntarily confined.[15]

▆ Application of either of these standards suggests that plaintiffs have proferred sufficient evidence to survive defendants' summary judgment motion insofar as it challenges the "failure to treat" claims. Specifically, plaintiffs have demonstrated triable issues of fact as to whether those class members with serious medical needs[16] were injured by being denied medical care and whether those inadequacies were sufficiently serious or common to justify the conclusion that they were the result of deliberate indifference by the State or its officials.[17]

▆ The key evidence proferred by plaintiffs is found in a series of affidavits by their designated psychiatric experts, who, by the time that the motion was briefed, had undertaken a review of the medical files of thirteen class members, all but one of whom appeared to be suffering from severe mental disorders.[18] Based

---

**15.** The contrary argument is that *Youngberg* is limited to the case of civilly committed patients. (As the Court in *Youngberg* indicated, such individuals "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 475 U.S. at 321–22, 106 S.Ct. at 1085.) Such a reading of *Youngberg* is not plainly wrong, *see, e.g., Doe v. New York City Dep't of Social Services, supra*, 709 F.2d at 790, but on balance it is perhaps more reasonable to view the distinction between civilly committed patients and criminal defendants as relevant to whether the individual is entitled to habilitation or training—*Youngberg* so holds with respect to mental patients—and not to the quality of medical care that both patients and inmates are entitled to as a condition of their involuntary confinement. Under this view, the "professional judgment" standard articulated in *Youngberg* can be applied to medical care as well as training, and governs the substantive due process claims of mental patients and inmates.

**16.** Since the class, as originally defined, encompassed all inmates housed in SHU during the relevant period, it is obviously overinclusive insofar as plaintiffs assert a "failure to treat" claim. In part to remedy this defect, plaintiffs propose subdividing the class into three subclasses, two of which are intended to include inmates with serious medical problems in the form of mental disorders. The appropriateness of such redefinition of the class is addressed below, *see* pp. 551–65, *infra*, but for purposes of the summary judgment motion I will assume that such a redesign of the class—or its substantial equivalent—will be approved and that the "failure to treat" claims are asserted only on behalf of those class members with mental disorders.

**17.** Defendants separately challenge plaintiffs' claim on the basis of their own asserted lack of responsibility for any constitutional deprivations. I address that issue separately below. *See* pp. 544–49, *infra*.

**18.** The inability of the experts to review a larger number of these files by that time is attributable to the fact that their files were not produced by defendants to plaintiffs' counsel until a month before the filing of their motion papers. In any event, a sampling of this type has been held sufficient to justify a preliminary injunction by demonstrating a probability of success on the merits. *See Todaro v. Ward, supra*, 565 F.2d at

upon their review of these files, which account for perhaps a quarter to a third of the class members who are alleged to suffer from the most serious disorders, these experts have offered similar conclusions suggesting serious inadequacies in the manner in which the State addressed the inmates' mental health problems.

Drs. Stuart Kleinman, Richard G. Dudley, and Stephen S. Teich each found strong indications of repeated and systemic failures in the provision of health care services to inmates with very serious mental disorders. These included such basic inadequacies as the failure to take a complete medical history, failure to keep adequate records, failure to take into account the inmate's prior psychiatric history, failure to see inmates suffering from seeming mental crises, failure properly to diagnose mental conditions, failure to prescribe proper medication and prescription of inappropriate medication, failure to provide any meaningful treatment other than medication, failure to justify decisions as to diagnoses or treatment or termination of treatment, and seemingly cavalier refusals to consider that an inmate's bizarre behavior could conceivably be the result of a genuine mental disorder, even though in some cases OMH had previously diagnosed the inmate as suffering from such a disorder. In describing their review of the OMH records, the psychiatrists cite repeated instances of what they view as dramatic failures to meet even minimal professional standards in providing psychiatric services, and a number of instances in which apparently unqualified or untrained personnel were performing functions that should have been undertaken by a psychiatrist or under his close supervision.

In addition, plaintiffs' expert Dr. Stuart Grassian offers an analysis of the severe psychological impact that placement in SHU is likely to have on disordered individuals, an impact that may be accentuated both by the alleged failure to provide minimally adequate screening and care for those placed on SHU and by the presence on SHU of other mentally ill inmates whose conditions involve dramatic outbursts of screaming, self-mutilation, attempted or staged suicides, throwing of feces and garbage, fires and other distressing behavior. Given this premise, the psychiatrists further opine that the failure to screen out from SHU those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there constitutes still another basic failure to provide adequate professional care.

Not surprisingly, based on these findings, the psychiatrists further opine that the individuals whose records they have reviewed suffered significant harm by virtue of the failings that they note. Moreover they indicate that the OMH records themselves reflect serious deterioration of most or all of the inmates while on SHU.

Even without reference to other evidence in the record, these affidavits are sufficient to create triable issues with respect to whether plaintiffs were injured by the deliberate indifference of state officials in the handling of medical care on SHU. They recount a significant number of individual instances of alleged outright denial of medical care for serious medical needs—conduct that, if proven, would plainly be tantamount to a violation of the inmates' rights under *Estelle*. They also describe repeated examples of significant delay—sometimes of many days—in providing any such services, which may also constitute a violation under the Eighth and Fourteenth Amendments. *See, e.g., Archer v. Dutcher, supra*, 733 F.2d at 16 (5–hour delay). *See also Bass v. Jackson, supra*, 790 F.2d at 263 (5–to–6–hour delay can constitute violation). They identify numerous occasions on which the services rendered could be viewed by a trier of fact as so egregiously poor that, even viewed in isolation, they reflect deliberate indifference on the part of the responsible prison officials. Finally, and perhaps most significantly, the testifying psychiatrists all find and document a pattern of alleged medical inadequacy that is so far-reaching and consistent as to persuade them that the mental health

53 n. 4. Necessarily, it suffices to demonstrate triable issues of material fact.

care efforts for SHU inmates reflected a systemic failure. Thus, even if none of the numerous individual failings themselves established a violation of constitutional rights on the basis of the prison officials' deliberate indifference, the pattern of consistent and repeated failures of this sort over an extended period of time would permit a trier of fact to conclude that the responsible officials were in fact deliberately indifferent. *See, e.g., Todaro v. Ward, supra,* 565 F.2d at 52.

In relying upon these experts' affidavits, I note that the opinion testimony of purported experts is not in all cases a guarantee against the adverse entry of summary judgment. If an expert's opinions rest on pure speculation or are directly contradicted by the factual record or are otherwise unworthy of even arguable belief, they may be rejected. *See, e.g., In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1258–59 (E.D.N.Y. 1985) (citing cases), *aff'd,* 818 F.2d 187 (2d Cir.1987). In this case, however, there is no basis at this stage for declining to give weight to the proffered testimony of plaintiffs' experts.

First, the opinions of these individuals are grounded in the evidentiary record, specifically the OMH medical records. Defendants do not demonstrate that the psychiatrists have misrepresented the content of those records. Second, the witnesses' credentials are plainly adequate to justify—for present purposes—their recognition as experts on the matters concerning which they are testifying. Third, the conclusions they reach are central to and supportive of plaintiffs' "failure to treat" claims. As such, their testimony constitutes sufficient evidence to withstand a Rule 50(a) motion at trial, and it thus withstands defendants' motion for summary judgment.

I also note that the record contains substantial additional evidence that, if credited, reflects a pattern of inadequate medical care to the mentally ill inmates housed on SHU. The record suggests repeated failures to conduct required psychological testing and evaluation (*see* Pl.Exh. 8 at 39–41; Exh. 7 at 53, 55, 64, 66, 70); failure

to inquire about the patient's prior history (Exh. 7 at 59); improper methods for making diagnoses (Exh. 7 at 60, 62); failure to monitor seizure disorders (Exh. 7 at 77; Exh. 6 at 190); improper placement on SHU of inmates with seizure disorders (Exh. 6 at 191–92); improper medication that exacerbated these disorders (Exh. 7 at 76–77); lack of any regular access to counselling for those in need, despite the importance of such regularity (Exh. 7 at 126, 127); an absence of criteria for DOCS personnel to follow concerning when to make referrals to OMH (Exh. 10 at 37); failure to follow mandated procedures for referral, with the result that no treatment was given those critically in need of it (Exh. 5 at Oct. 9, 1986; Exh. 2); a consistent failure by OMH to monitor inmates' behavior for deterioration or crises for purposes of rendering treatment (Exh. 7 at 22, 23, 41, 42; Exh. 6 at 152–53; Exh. 21); minimal counselling (Exh. 2 at ¶ 10); failure to develop adequate treatment plans (Exh. 7 at 72; Exh. 6 at 79, 96, 118–20; Exh. 7 at 98–99); failure to comply with state standards for "quiet rooms" for inmates removed from SHU as a result of mental crisis (Exh. 7 at 110 & 42); improper procedures for determining medication (Exh. 7 at 40; Exh. 13; Exh. 8 at 295, *see also* Exh. 6 at 136; Exh. 7 at 75–76); displays of hostility by prison psychiatrists to their female patients (Exh. 7 at 44–45; Exh. 13; Exh. 14 at ¶¶ 10, 27), which sometimes led to outright refusals to treat (Exh. 7 at 24, 26, 37–38, 40); placement of inmates on SHU when such assignment would predictably cause exacerbation of already several mental disorders (Exh. 6 at 116–18; Exh. 7 at 104–05); and a failure to maintain any capacity to treat inmates who were assaultive or aggressive but could not tolerate isolation. (Exh. 22; Exh. 3 at 115–16; Exh. 21.)

The record also contains substantial evidence reflecting the injuries allegedly suffered by the mentally disordered inmates as a result of these various failings. (*See* Exh. 1 (Plaintiffs' Responses to Defendant Klug's Second Set of Interrogatories) at Question 20; Exh. 2 (Affidavits of Judith Clark, Annie Eason, Vermell Whit-

ley); Exh. 29; Exh. 7 at 104–05; Exh. 17 at 63–64; Exh. T to plaintiffs' motion for preliminary injunction.)

This congeries of evidence is ample to sustain plaintiffs' burden of proof that they were injured by a failure to treat serious medical needs. As noted, many of these alleged failings appear to be so serious that, even viewed in isolation, they could justify a finding of deliberate indifference. Moreover, the consistency of the pattern adds further weight to the plaintiffs' case. Based on this evidence, a trier of fact could conclude that the responsible state officials were aware of the limitations of the mental health care system for SHU inmates and simply chose—for whatever reason—not to correct the situation. These findings would suffice to justify a conclusion that plaintiffs' rights were violated under both the Eighth and the Fourteenth Amendments.[19]

Finally I note that, as a separate matter, the record is adequate to find a violation of substantive due process under the *Youngberg* analysis, assuming it to be applicable. First, there is evidence that a number of decisions were made by untrained personnel that should have been made by psychiatrists or others adequately trained and under close supervision. Second, to the extent that some of the decisions were arguably motivated by the personal hostility of the psychiatrists or other staff towards the inmates, those decisions would not reflect the exercise of "professional judgment." Third, to the extent that some of the decisions may represent substantial deviations from any defensible professional standard, a trier of fact could conclude that they do not reflect the exercise of "professional judgment." Fourth, there is some question in the record concerning the professional credentials of Dr. Klug, who administered the mental health care system at Bedford Hills and was directly responsible for many treatment deci-

sions with respect to plaintiffs' care. Depending on the resolution of this question, it is possible that a trier of fact could find Dr. Klug to have been professionally unqualified for his position at the prison and thus by definition incapable of exercising "professional judgment" to which deference might be due under *Youngberg*. *See* 457 U.S. at 323 & n. 30, 102 S.Ct. at 2462 & n. 30.

### 2. *Conditions of Confinement*

It has long been recognized that, consistent with the discretion ordinarily accorded prison administrators, even convicted felons "have a constitutional right to decent and humane conditions...." *Society for Good Will to Retarded Children v. Cuomo, supra,* 737 F.2d at 1243 (citing *Estelle v. Gamble, supra*). The obligation of the state with respect to conditions of confinement is not defined with rigorous clarity by the Supreme Court, which has instead referred to "the contemporary standard of decency," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (*citing Estelle v. Gamble, supra*), as a means of measuring whether conditions fall below constitutional minima. A further articulation of this general principle is that "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* The State must, in other words, ensure all inmates "the minimal civilized measure of life's necessities." *Id.; Anderson v. Coughlin,* 757 F.2d 33, 34–35 (2d Cir.1985). In judging the adequacy of challenged conditions, the central focus appears to be on whether they result "in pain without any penological purpose." *Rhodes v. Chapman, supra,* 452 U.S. at 347, 101 S.Ct. at 2399 (citing *Estelle v. Gamble, supra,* 429 U.S. at 103, 97 S.Ct. at 290).

---

**19.** I note that to the extent that some of the evidence could be viewed as reflecting significant hostility by treating psychiatrists at Bedford Hills to the SHU inmates in need of care, a trier of fact could even conclude that the failures of treatment were in fact motivated by a desire to punish. As noted, such a finding is clearly not necessary for a due process violation and is apparently not necessary—in this type of case—for an Eighth Amendment violation, but it would be sufficient to establish either.

Deference to the judgment of the prison administrators is most substantial when their decisions involve matters of prison security. *See, e.g., Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 1085–86, 89 L.Ed.2d 251 (1986); *Hudson v. Palmer,* 468 U.S. 517, 527–28, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984); *Rhodes v. Chapman, supra,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14; *Bell v. Wolfish, supra,* 441 U.S. at 547, 99 S.Ct. at 1878. It is less so when the condition in question does not itself implicate security concerns. *See, e.g., Rhodes v. Chapman, supra,* 452 U.S. at 362, 101 S.Ct. at 2407 (Brennan, J., concurring); *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1033 (2d Cir. 1985). *Cf. Stubbs v. Dudley,* 849 F.2d 83, 86 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989) (giving less deference when the only security threat is the incident about which plaintiff complains). Moreover, notwithstanding the recognized complexity of administering penal institutions and the assumed expertise of their administrators, "deference" by the courts is not tantamount to abdication. If conditions are unjustifiably harsh, judicial remedies are available. *See, e.g., Rhodes v. Chapman, supra,* 452 U.S. at 352 & n. 17, 101 S.Ct. at 2402 & n. 17 (citing cases). *Accord, id.* at 352–54 & n. 1, 101 S.Ct. at 2402–03 & n. 1 (Brennan, J., concurring).

More specific guidance may be found in cases addressing some of the types of "conditions" that form the predicate for plaintiffs' "conditions of confinement" claims in this case. However, it is necessary to bear in mind that a multiplicity of challenged conditions may have a more acute effect on the inmates than would any one in isolation. It is the cumulative effect of the conditions that must be weighed. *See, e.g., Rhodes v. Chapman, supra,* 452 U.S. at 362–63, 101 S.Ct. at 2407 (Brennan, J., concurring) (citing *Holt v. Sarver,* 309 F.Supp. 362, 373 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (4th Cir.1971); *Laaman v. Helgemoe,* 437 F.Supp. 269, 322–23 (D.N.H.1977)).

In this case plaintiffs allege that life on SHU routinely and on a continuing basis involved exposure to the smell of the filth that accumulated in the cells of some of the disturbed inmates, the sight and smell of feces and other malodorous objects that were thrown by the disturbed inmates out of their cells, constant intense noise resulting principally from the deranged screaming of some of the disturbed inmates, the smell and choking sensation and fear occasioned by fire and smoke that resulted from the setting of fires by the disturbed inmates, fear of and actual assaults by some of those inmates (presumably during the one hour per day during which the SHU inmates were released from their cells), and the sounds and occasional sights of deranged inmates attempting to hang themselves or engaging in self-multilation or hallucination or other forms of seemingly demented activity.

The record contains evidence from which a trier of fact could conclude that some or all of these types of conditions were a fact of life on SHU from 1981 to 1987. Indeed the prison's own records contain a list of so-called "unusual incidents" of this nature and it reflects a seemingly high incidence of such events. Similar evidence is reflected in the affidavits of several of the plaintiff class members. (*See* Exh. 2—Affidavits of Judith Clark, Annie Eason, Vermell Whitley, Patsy Kelly Jarrett). Moreover, with regard to certain of the conditions, particularly noise, both non-party witnesses and the defendants themselves have acknowledged—both by testimony and by documentary evidence—its severity and uninterrupted nature. (*See, e.g.,* Exh. 6 (Koson Dep.) at 35, 38, 106–07; Exh. 10 (Duncan Dep.) at 34; Exh. 17 (Lord Dep.) at 63–64, 82; Exh. 21 at 1; Exhs. 26–30.)

If credited, this evidence could permit the conclusion that during some or even all of the relevant time period, conditions on SHU severely threatened the mental or physical well-being of all inmates housed there, a finding that would permit a conclusion that the Eighth Amendment rights of the inmates were in fact violated. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 566–78 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Even considered in isolation, the existence of un-

sanitary conditions and noxious odors, *e.g., LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir.1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Wright v. McMann*, 387 F.2d 519, 525–26 (2d Cir. 1967), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), the constant sound of the "screamers," *e.g., Rhem v. Malcolm*, 371 F.Supp. 594, 627–28 (S.D.N. Y.), *aff'd*, 507 F.2d 333 (2d Cir.1974), the threat or presence of fire and smoke, *e.g., Hoptowit v. Spellman*, 753 F.2d 779, 783– 84 (9th Cir.1985); *Coniglio v. Thomas*, 657 F.Supp. 409, 413–14 (S.D.N.Y.1987); and the constant exposure to the bizarre and occasionally assaultive behavior of deranged inmates, *cf. Morales v. New York State Dep't of Corrections*, 842 F.2d 27, 30 (2d Cir.1988), all could be viewed as being without evident penological purpose and therefore as inconsistent with the standards mandated by the Eighth Amendment. Moreover, if several of these conditions existed to some degree and in some combination, a trier of fact might even more reasonably conclude—taking into account the likely cumulative effect of these conditions on the inmate, *see Rhodes v. Chapman, supra*, 452 U.S. at 362–63, 101 S.Ct. at 2407 (Brennan, J., concurring)—that the challenged conditions violated the basic requirement of "decent and humane conditions." *Society for Good Will to Retarded Children v. Cuomo, supra*, 737 F.2d at 1243.[20]

In seeking to avoid this conclusion, defendants appear to put much weight on the fact that the relevant prison log does not itself establish that so-called unusual incidents occurred every day. This argument is beside the point. First, it is not at all clear why plaintiffs must show that specific incidents occurred daily for the entire six years in order to establish their claims. Depending on the nature of the incidents, even their periodic occurrence might establish a continuing constitutional violation. Second, plaintiffs' claims

rest nc. merely on the specific incidents such as suicide or arson attempts, but on the general conditions that are said to have continued for extended periods of time—including unhygienic conditions, noxious odors, very loud noise, and reasonable fear of the frequently recurring incidents. Third, there is a dispute as to whether the prison log reports all of the incidents that took place, and thus the content of the log cannot provide a basis for summary judgment by defendants. Fourth, there is a substantial body of evidence, some of which is cited above, suggesting the pervasive nature and severity of the conditions that plaintiffs are alleging. Given this evidence, summary judgment would not be appropriate in any event. Finally, even if conditions on SHU were entirely acceptable for extended periods of time, this would not bar members of the class from proving a violation of their constitutional rights for even short periods during which conditions were not constitutionally sustainable. *See, e.g., Sostre v. McGinnis*, 442 F.2d 178, 193 n. 23 (2d Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) ("In some instances ... five days or even one day might prove to be constitutionally intolerable.").

In sum, plaintiffs have proffered sufficient evidence to demonstrate triable issues of fact with respect to whether the conditions of confinement on SHU for all of its residents were constitutionally deficient during the period from 1981 to 1987. Accordingly, summary judgment cannot be entered for defendants on this question.

### 3. The Involvement of the Individual Defendants

Even if plaintiffs prove that their constitutional rights were violated and that they were injured as a result, they face two additional hurdles in their effort to hold defendants liable. First, they must establish that it was the defendants who were responsible in some meaningful way for

---

**20.** This evidence is a far cry from the record in *Anderson v. Coughlin, supra*, 757 F.2d at 35–36, which defendants prominently cite. The issue in that case concerned the adequacy of the SHU inmates' opportunities for exercise, and the

Court there noted that the very fact of placement on SHU involves significant constraints on personal freedom that are constitutionally permissible even if distressing to the inmates.

the violations. Second, since defendants are invoking a qualified immunity defense, plaintiffs must contend with the question of whether the defendants' "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The District Court has itself addressed the immunity question, and I therefore consider only the issue of whether the individual defendants are entitled to summary judgment based on their claimed lack of responsibility for the asserted constitutional violations.[21]

■■■ Section 1983 imposes liability only on a person who "subjects or causes [the plaintiff] to be subjected" to a constitutional violation. 42 U.S.C. § 1983 (1982). Accordingly, a defendant cannot be held liable under that section unless he was personally involved in the complained-of action. *See, e.g., Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* — U.S. —, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Gill v. Mooney, supra,* 824 F.2d at 196; *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

Liability of a supervisory official may be premised on various types of involvement in the alleged wrongdoing. As summarized by the Second Circuit:

> The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory

official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams v. Smith, supra,* 781 F.2d at 323–24 (citations omitted). Although this summary was written more than three years ago, it appears still to be good law, *e.g., Bellamy v. McMickens,* 692 F.Supp. 205, 211–12 (S.D.N.Y.1988), except that, in the wake of *City of Canton v. Harris, supra,* 109 S.Ct. at 1204, it may be the case that inadequate supervision of subordinates is not constitutionally actionable unless it is so egregious as to demonstrate "deliberate indifference" to defendants' rights.[22]

The four moving defendants seem to argue that they had no responsibility for the constitutional violations, if any, that plaintiffs suffered. Based upon the applicable standards, I conclude that defendants have not justified the entry of summary judgment in their favor on this question.

a. Commissioner Coughlin

■■■ As New York State Commissioner of Correctional Services, defendant Coughlin has responsibility for the operation of the entire prison system. There appears to be no dispute that he was not directly involved in the delivery, or non-delivery, of mental health services to the inmates on SHU at Bedford Hills and did not have an active role in deciding how that particular unit should function. Similarly there is no real dispute that he did not directly supervise on a continuing basis the individuals who were responsible for psychiatric care on the unit.

---

**21.** There are points at which the distinction between these two issues may be somewhat blurry. For present purposes I treat any issue as to whether defendants had the authority to define or alter conditions affecting the SHU inmates as coming within the scope of my reference. To the extent that the defendants may be claiming that funding was inadequate to alter some of the challenged practices or conditions, that question is for the District Court. *See, e.g., Youngberg v. Romeo,* 457 U.S. at 323, 102 S.Ct. at 2462 (claims of budgetary constraints can establish qualified immunity defense). In addition, defendants' arguments that the caselaw at

the relevant time did not require them to take the steps that plaintiffs claim they should have taken was disposed of by the District Court.

**22.** I note that *City of Canton* involved an issue of municipal liability for inadequate training. Nonetheless, if failure to train or supervise can amount to actionable conduct—whether by a town or by an individual official—it seems logical to determine liability for the individual or institutional supervisor under the same general standard.

There is, however, some evidence that he was aware of the general and continuing problems of mental health care in SHU at Bedford Hills and a reasonable argument could be made that, as Commissioner, he could have acted to correct the situation but chose not to do so. As Commissioner it was his responsibility to "establish programs in such correctional facilities as he may deem appropriate for the treatment of mentally ill inmates confined in state correctional facilities who are in need of psychiatric services but who do not require hospitalization for the treatment of mental illness." N.Y.Corr.Law § 401 (McKinney 1987.) He carried out this task through a Memorandum of Understanding with the Office of Mental Health under which OMH was designated to provide psychiatric services to inmates. (State Defts. Exh. V.)

Plaintiffs suggest that a major source of the problems encountered at Bedford Hills is the failure of this Memorandum of Understanding to provide for the care of chronically mentally ill inmates who require long-term care. This conclusion is supported in the record by deposition testimony of both Dr. Charles Broaddus, the Assistant Commissioner of DOCS for Health and Mental Health Services, (Exh. 3 at 115–16) and Bedford Hills Superintendent Lord (Exh. 17; *see also* Exh. 21), both of whom acknowledge that DOCS did not provide for such services. It is also documented in a report of the Correctional Association of New York, published with the endorsement of DOCS, which states:

> Each of the services provided by OMH—Psychiatric Satellite Units, Intermediate Care Programs, and inpatient care at Central New York Psychiatric Center—have as their primary goal meeting the needs of those inmates who may periodically suffer a mental health crisis, and even require acute psychiatric care. None is designed to meet the ongoing, more permanent needs of those inmates who can be described as chronically mentally ill, that is, their mental illness stays with them, it does not "come and go."

"The Mentally Impaired in New York's State Prisons," at 28 (1987) (Exh. 22.)

This failure alone could conceivably persuade a trier of fact that Commissioner Coughlin is responsible for denial of care to plaintiffs and that this failure is so egregious as to suggest deliberate indifference. In addition, however, Commissioner Coughlin has long been on notice of the problems engendered by the inadequacy of the arrangements originally made with OMH. Thus, in 1980, a class of inmates at Attica Correctional Facility commenced a lawsuit entitled *Eng v. Smith*, 80 Civ. 3855 (W.D. N.Y.), in which they named Commissioner Coughlin as a defendant and raised the same problems at that all-male facility. That suit, which is still pending, *see, e.g., Eng v. Smith*, 849 F.2d 80 (2d Cir.1988), has, among other things, led to a preliminary injunction premised upon a finding of likely success for plaintiffs' claims of constitutional deficiencies in the care provided to mentally ill inmates placed on SHU. *Id.* at 81–83. In addition, Commissioner Coughlin was specifically alerted to the same problems at Bedford Hills by the service on him in 1983 of the complaint in the first of these two parallel lawsuits, *Evans v. Coughlin*, 83 Civ. 7172, and the service in 1984 of the more detailed pleadings in *Langley v. Coughlin*, 84 Civ. 5431. Since there is evidence suggesting that no meaningful change occurred at the Bedford Hills SHU until late 1987, following the parties' settlement of the injunctive claims in this case, a trier of fact could well view such asserted inaction in the face of explicit notice of problems as tantamount to deliberate indifference by Commissioner Coughlin.

In sum, the present record is adequate to demonstrate that there are triable issues of fact with respect to defendant Coughlin's personal responsibility for allegedly unconstitutional conditions on SHU at Bedford Hills. Accordingly, summary judgment as to this issue should be denied.

b. Superintendent Lord

The case against defendant Lord rests on substantially different factual premises. Until July 1984 she was Deputy Superintendent at Bedford Hills, and at that time she succeeded Frank Headley as Superin-

tendent of the facility. She still holds that post.

In seeking summary judgment, defendant Lord does not suggest that she was unaware of conditions on SHU at any relevant time, and indeed the record is to the contrary. Rather, she appears to argue that she did not have the authority, as Deputy Superintendent or Superintendent, to transfer any inmate out of SHU or to order psychiatric services and that she did not have the expertise to diagnose or treat mental disorders. (*See* Lord Aff. at ¶¶ 13, 15–19.) She also cites her own efforts, while Deputy Superintendent, to alleviate the conditions adversely affecting plaintiff-intervenor Michelle Burris, who appears to have been the most seriously afflicted and troubled inmate in the institution and who spent very long periods on SHU. (*Id.* at ¶¶ 25–27.)

■ Plaintiffs face a potentially difficult task in establishing liability on the part of Superintendent Lord. Indeed, their phrasing of a portion of their argument on the present motion suggests that difficulty. Thus, after acknowledging "the limited intervention made [by Lord] on behalf of Michelle Burris ..." (Memorandum at 17), they argue that her actions "on behalf of one inmate hardly establishes that she did everything reasonably within her power to correct the deliberate indifference shown to a class of women, or even that she did everything within her power to protect Michelle Burris." (*Id.* at 17–18.) The relevant inquiry is not, as this argument appears to suggest, whether a prison official did "everything reasonably within her power ..." or "everything within her power ..." to provide adequate services. *See Anderson v. Coughlin, supra,* 757 F.2d at 36 ("The Eighth Amendment does not guarantee ... that all reasonable steps will be taken to minimize the risks" of injury to prisoners' health and well being). Rather, it is whether her conduct reflects deliberate indifference to the protected interests of the inmates.

■ Notwithstanding the fact that this standard is far more difficult to meet, I conclude that summary judgment is not warranted on the asserted basis that defendant Lord was not responsible for the alleged constitutional violations.[23] First, it seems plain that defendant Lord was at all relevant times well aware of the conditions on SHU and of the fact that they were entirely unsatisfactory. Second, it appears that defendant Lord's responsibilities as Deputy Superintendent until July 1984 were sufficiently broad to encompass conditions encountered by the disturbed inmates on that unit. Indeed, her recounting of the steps that she took on behalf of Ms. Burris —which involved education, counselling, diet, and exercise—at least suggests that she viewed her job as encompassing the quality of conditions on SHU for all inmates and particularly for those suffering from severe mental illness. Third, she apparently had some direct responsibility for one of the mental health facilities at Bedford Hills, the Intermediate Care Unit. Fourth, based on her awareness of the problems and her apparent authority even as Deputy Superintendent to act to remedy at least some of these problems, a trier of fact could conclude that her limited efforts, solely on behalf of Ms. Burris, reflect (a) her interest in Ms. Burris as a "special project" and (b) her indifference to the fate of the other inmates housed on SHU who were seriously in need of attention. *Cf. Doe v. New York City Dep't of Social Services, supra,* 709 F.2d at 791 (attentiveness to plaintiff's general care does not preclude deliberate indifference finding "respecting one very significant aspect of her welfare.").

The extent of the corrective action that defendant Lord might have taken as Deputy Superintendent and the inferences to be drawn about her state of mind in not taking them are matters appropriately left to the trier of fact. Although plaintiffs may find it difficult to prove that she was deliberately indifferent to their rights while Deputy Superintendent, they are entitled

---

**23.** As noted, I do not address any issues involv-

ing her asserted qualified immunity defense.

on the present record to attempt to prove it.

The case against defendant Lord is somewhat stronger from July 1984 to the end of the period in question since she served during that time as Superintendent. There is surely reason to believe that she had authority in that position to take steps to ameliorate conditions in SHU. *See, e.g., Wright v. McMann*, 460 F.2d 126, 134–35 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). Both the conditions of confinement and the quality of medical care rendered by the prison are matters within the responsibility of the Superintendent, and if steps could have been taken and were not during defendant Lord's tenure to alleviate those conditions, a trier of fact could conclude that she was in fact deliberately indifferent to those conditions. *See, e.g., Todaro v. Ward, supra*, 565 F.2d at 52.[24]

### c. Dr. Klug

There is little question that defendant Klug, who was Unit Chief at Bedford Hills, had the requisite involvement in the treatment of the SHU inmates to be potentially responsible for violations of their constitutional rights arising from their treatment or lack of it. He was directly responsible for evaluating and treating inmates on SHU and many of the examples cited by plaintiffs' experts as evidence of blatantly unprofessional conduct by the psychiatric staff involved Dr. Klug's own performance. Moreover, as Unit Chief, he was responsible generally for the manner in which psychiatric care was provided to inmates, and thus such systemic inadequacies as may have existed could be traceable to decisions by him concerning the manner in which the unit was to operate.

I no. that, in his separate motion, Dr. Klug appears to argue that plaintiffs must prove an intent to punish. (*See* Memorandum at 6 (citing *Gill v. Mooney, supra*, 824 F.2d at 196).) As already noted, this is not correct, but in any event the present record would permit a trier of fact to infer such motivation. The refusal by OMH, and by Dr. Klug in particular, to take seriously the repeated bizarre and self-destructive behavior by inmates previously found by OHM to be mentally ill, and his characterization of such inmates as merely "manipulative" or otherwise unworthy of treatment, suggests that he may not have been acting as a disinterested healer. Under the foregoing circumstances, and in view of the questions raised concerning whether Dr. Klug was in fact qualified to perform the functions entrusted to him—he was unlicensed and holds only a master's degree in educational psychology and a doctorate in counselling psychology from an unaccredited institution—it can scarcely be said that Dr. Klug is entitled to summary judgment absolving him from responsibility for any of plaintiffs' constitutional claims.

### d. Captain Duncan

Plaintiffs' most limited case is that made with respect to then-Lieutenant and now-Captain George Duncan. Defendant Duncan was the discipline and security lieutenant and then captain in charge of uniformed personnel at Bedford Hills. The particular failings for which plaintiffs seek to assign him blame involve (a) preparation of an allegedly inadequate policy and procedure manual for Building 118, which housed SHU, (b) failure to seek or obtain from OMH any training for the staff on SHU for dealing with the mentally ill inmates, and (c) an alleged pattern of refusals by either the corrections officers or their supervisors on SHU to have inmates

---

**24.** Plaintiffs suggest a number of possible steps that could have been taken by defendant Lord to improve conditions on SHU, including placing severely disturbed inmates in a mental observation cell on the Satellite Unit, altering the role of the Intermediate Care Unit to provide at least some services to the mentally disordered inmates, provision of training to DOCS officers on SHU on how to handle the disturbed inmates and allocation of space at the SHU building to OMH for provision of psychiatric services to its residents. (Plaintiffs' Memorandum at 20–21.) The degree to which any of these steps was feasible and the likely effect of such an effort appears to be in dispute. Such disputes—to the extent that they are relevant to defendant Lord's liability—are appropriately resolved by the trier of fact and not by summary judgment.

sent to a mental observation cell when the inmate was suffering a mental crisis.

The record on these matters is thin. With respect to the manual, plaintiffs' argument is that, although recognizing the importance of referrals of disturbed inmates to OMH, defendant Duncan failed to provide instructions for such referrals in the manual. As for training, although he perceived the importance of procedures to ensure that disturbed inmates receive appropriate attention by OMH, he did not seek training of the corrections officers by OMH for the purpose of instructing them on how to recognize behavior patterns that would require such referrals. Plaintiffs also note that the corrections staff at SHU, under Duncan's supervision, frequently failed to request referrals despite the obvious need for it and when they did request it, their supervisors "often denied the officer's request ..., thereby denying the women necessary mental health care." (Plaintiffs' Memorandum at 25.)

The last point is potentially the most serious since a denial of access to obviously needed medical care can amount to an Eighth Amendment violation. *See, e.g., Archer v. Dutcher, supra,* 733 F.2d at 16; *see also Gill v. Mooney, supra,* 824 F.2d at 196. The principal question about the adequacy of plaintiffs' showing is the somewhat tenuous nature of the link to defendant Duncan personally. Indeed, plaintiffs do not squarely assert that he ever denied a referral request or encouraged others to do so. Nonetheless, this deficiency in proof may be overcome by two facts. First, Duncan was supervisor for an extended period of time and thus was presumably well acquainted with the particular problems encountered on SHU and the need for an appropriate referral system. Indeed, he so testified at his deposition (Exh. 10, Duncan Dep., at 34–35). Despite this awareness, it appears that proper procedures for referral may never have been established on SHU. Specifically, the review by plaintiffs' psychiatric experts of the medical records reflects many instances of no treatment or delayed treatment for very obvious psychiatric needs.

This conclusion is further supported by the fact that the officers on SHU were never trained by OMH with regard to the handling of disturbed inmates. (*See id.* at 37.) Thus a trier of fact might infer that Duncan was aware of the problems and took no steps to remedy them even though corrective measures were within his power, and from such a conclusion the trier of fact might infer that he was deliberately indifferent to the needs of the mentally ill SHU inmates. Second, Duncan's asserted failure to include instructions for psychiatric referral in the manual that he prepared—although in itself seemingly an isolated failing tantamount at most to negligence—might, if viewed in context, be a further indication that he was simply indifferent to the plainly perceived need of SHU inmates for prompt psychiatric consultation and treatment on an "as needed" basis.

I make no prediction as to the likelihood that plaintiffs will prevail on their claim against Captain Duncan. I find only that the current record reflects triable issues of fact that are material to whether he acted with deliberate indifference to plaintiffs' psychiatric needs. Accordingly, I recommend denial of summary judgment insofar as it is premised on his asserted lack of responsibility for any violation of plaintiffs' constitutional rights.

### 4. Punitive Damages

Defendants also seek summary judgment with respect to plaintiffs' prayer for an award of punitive damages. In view of the state of the record, a determination of the merits of this claim at this stage is premature.

The availability of punitive damages turns heavily on questions concerning defendants' state of mind at the time of their actions. *See, e.g., Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) (punitive damages available in section 1983 action upon showing of evil motive or intent, or reckless or callous indifference). This is an area ordinarily considered inappropriate for summary judgment, *see Montana v. First Federal Savings & Loan Ass'n, supra,* at 104; *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984),

and this case is no exception. Both the seriousness of the alleged violations and the degree of indifference or malice with which defendants may have acted or failed to act are questions concerning which the parties have defined triable issues of fact. Accordingly, summary judgment is not warranted.

## II. *Dismissal Based Upon Eleventh Amendment Immunity*

Defendants appear to argue that plaintiffs' claims should be dismissed because the Eleventh Amendment bars any damage claims against them. They also assert that the cross-claim by Dr. Klug against OMH for indemnification should be dismissed on the same ground. Their argument against plaintiffs' claims is plainly meritless; their challenge to Dr. Klug's cross-claim is sustainable.

### A. Plaintiffs' Claims

It is not open to question that the Eleventh Amendment would bar a claim for money damages against the State itself or its agencies. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Plaintiffs, however, are not seeking a damage award against the State or any of its governmental entities. Although the complaint names the various defendants in both their official and their individual capacities, the "official" designation is for the purpose of obtaining injunctive and declaratory relief, a matter long since addressed and settled.

As for damage suits against government officials in their individual capacities, any relief would be directed against the individual and not the State. Accordingly, the Eleventh Amendment would not bar entry of a judgment against the defendants even though they may have been carrying out official state policies. *See, e.g., Farid v. Smith*, 850 F.2d 917, 921–23 (2d Cir.1988).[25]

### B. Dr. Klug's Cross–Claims

Dr. Klug has asserted a cross-claim against OMH and various individual defendants, seeking indemnification in the event that he is found liable to plaintiffs. OMH, as an arm of the State, invokes the immunity protection of the Eleventh Amendment and seeks dismissal of this cross-claim insofar as it asserted against OMH. That relief is warranted since the only possible source of a right to reimbursement by Klug from the State is state law, and the federal courts are barred by operation of the Eleventh Amendment from adjudicating state law claims against the State. *See, e.g., Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984); *Society for Good Will to Retarded Children v. Cuomo, supra*, 737 F.2d at 1250.

The availability of indemnification in a suit under the federal civil rights laws is itself a question of federal law, *see, e.g., Anderson v. Local Union No. 3, Int'l Bhd. of Electrical Workers*, 582 F.Supp. 627, 632–33 (S.D.N.Y.1984), *aff'd*, 751 F.2d 546 (2d Cir.1984); *Valdez v. City of Farmington*, 580 F.Supp. 19, 20–21 (D.N.M.1984); *cf., Fishman v. DeMeo*, 604 F.Supp. 873, 874–75 (E.D.Pa.1985) (citing *Miller v. Apartments & Homes of New Jersey, Inc.*, 646 F.2d 101, 107–08 (3d Cir.1981)), and the courts have not supplied a clear answer to that question when the claim arises under 42 U.S.C. § 1983. *See Valdez v. City of Farmington, supra*, 580 F.Supp. at 21. *Cf. Anderson v. Local Union No. 3, supra*, 582 F.Supp. at 632–33 (no indemnification under section 1981 if defendant also liable under Title VII).

We need not reach this issue, however, since even if indemnification were otherwise available under section 1983, it could not save Klug's claim. He seeks such an award against the State, and section 1983 does not embody a congressional invasion of the Eleventh Amendment's grant of im-

---

**25.** Whether the State chooses to reimburse defendants against whom a judgment is entered is a matter for it to decide, but that decision has no relevance for purposes of Eleventh Amendment analysis. *See id.* at 923.

munity to the states. *See Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Necessarily, then, even if a defendant could ordinarily seek indemnification under section 1983, such a claim against a state would still be barred. *Cf. United States v. City of Yonkers*, 592 F.Supp. 570, 592 (S.D.N.Y.1984).[26]

Defendant Klug may conceivably have a claim for indemnification against the State premised on N.Y. Public Officers Law § 17, which provides for reimbursement of public officials held liable for damages in the performance of their official duties. Although this statutory provision may be deemed a waiver of immunity by the State, "a state may ordinarily waive its immunity from liability without waiving its power to choose the court or jurisdiction in which it allows itself to be sued." *Barrett v. United States*, 853 F.2d 124, 129 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989). Accordingly, unless the state "explicitly ... waive[s] immunity to suit in federal court," *Minotti v. Lensink*, 798 F.2d 607, 611 (2d Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987), the Eleventh Amendment bars assertion in federal court of a claim based on that waiver. *See, e.g., Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed. 2d 171 (1985); *Barrett v. United States, supra*, 853 F.2d at 129–30; *Minotti v. Lensink, supra*, 798 F.2d at 611. Since New York State has not authorized the assertion of a claim under the Public Officers Law in federal court, defendant Klug's claim may not be heard in this forum.

**26.** The indemnification claim may also be deficient because, even if the Eleventh Amendment immunity were disregarded and even if we assumed *arguendo* that section 1983 permitted such a cross-claim, the nature of the alleged wrongdoing by Klug is inconsistent with generally recognized standards for obtaining indemnification. As noted in *Anderson*:

Indemnity, like contribution, cannot be allowed in favor of an intentional tortfeasor. Indeed, the rationale for this rule is even stronger in the case of indemnity, because an intentional tortfeasor receiving indemnification would escape liability completely for his own deliberate wrongdoing.

582 F.Supp. at 633. As noted, the standards for liability on plaintiffs' asserted claims require a

### III. *The Motion to Decertify the Class*

Plaintiffs moved for class certification in 1985, when it could fairly be said that the predominant relief sought was injunctive and declaratory in nature. As a result, they were granted certification under Fed. R.Civ.P. 23(b)(1)(A) and 23(b)(2). *See, e.g.,* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.45[1] at 23–296 & nn. 39–40 (2d ed. 1987) (citing cases).

The subsequent partial settlement among the parties has disposed of plaintiffs' claims for such relief. Accordingly the case to be tried is essentially one for compensatory and punitive damages. In view of this altered status, defendants have moved to decertify the class. Defendants start from the proposition that, in view of the unusual circumstances posed by the settlement of a portion of the case, the Court should in effect deem the prior certification void and require plaintiffs once again to satisfy all of the Rule 23 criteria for certification. Given this premise, defendants contend that, for a variety of reasons—principally relating to the need for individualized proof of liability and damages—plaintiffs cannot do so.

In contrast, plaintiffs seek a modification that redefines the class as one certified under Rule 23(b)(3) for purposes of the compensatory damage claims generally. They also seek certification under Rule 23(b)(1)(B) for purposes of both the punitive damages claims and the damages claims against defendant Klug, based on a "limited fund" theory.[27]

finding, at a minimum, that the defendant acted with "deliberate indifference" to the safety and well-being of the plaintiffs, a standard that implies a "course of action deliberately chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Under these circumstances, it appears that even under the common-law rule Klug would be barred from recovering in indemnification.

**27.** Plaintiffs alternatively suggest retention of Rule 23(b)(2) certification because they still seek declaratory relief. In fact it is obvious that the predominant relief sought is damages and the purported declaratory relief is tantamount

The modified class proposed by plaintiffs would encompass all persons housed in Building 118 at Bedford Hills—including both SHU and protective custody inmates—from August 31, 1981 until August 20, 1987, the date on which the injunctive settlement was approved. Since this class would include all such inmates, and not merely those with serious medical needs—a prerequisite for assertion of a "failure to treat" claim—plaintiffs propose to define three subclasses. The first would be designed to encompass inmates with the most extreme mental problems and who were the source of at least some of the conditions that led to the "conditions of confinement" claim.[28] According to plaintiffs, these inmates' condition was so severe that their placement on SHU in itself constituted a violation of their Eighth Amendment rights. The second subclass is intended to include all other inmates with serious psychiatric needs,[29] and the third would account for all other inmates housed in Building 118 during the relevant time.

Under this arrangement, all three subclasses would assert a "conditions of confinement" claim, but only the first two would be seeking recovery for failure to treat serious medical needs. The division of the "failure to treat" group into two subclasses is apparently intended to account for both the fact that the claims of alleged medical failures with respect to the most seriously ill group are of a somewhat broader nature than the claims concerning the failure to treat the less severely disturbed inmates,[30] and the fact that at least some of the inmates in the first subclass were the source of some of the disruptive conditions about which all class members complain.

For the reasons that follow, I conclude that modification along the lines suggested by plaintiffs, albeit with some modifications, is both feasible and appropriate. I further conclude that decertification is not justified.

## A. The Appropriateness of Class Certification

 Defendants' initial assumption—that plaintiffs must now carry precisely the same burden as when they originally sought certification—is doubtful. *See, e.g., Woe v. Cuomo,* 729 F.2d 96, 107 (2d Cir.), *cert. denied,* 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984) (emphasizing drastic effect of decertification and potential injury to class members who relied on initial certification); *Samuel v. University of Pittsburgh,* 538 F.2d 991, 995–96 (3d Cir.1976) (cautioning against decertification of class at late stage based solely on need for individualized proof of damages); 3B *Moore's Federal Practice, supra,* at ¶ 23–345 to 346 (citing cases); *Manual for Complex Litigation* § 30.18 (2d ed. 1986). At a minimum, in such circumstances the Court must take into consideration that an eve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests. In any event the record in this case supports the conclusion that decertification is not necessary and that a modification of the class certification to invoke Rule 23(b)(3) in place of Rules 23(b)(1)(A) and (b)(2) is appropriate.

simply to a declaration of liability, for which plaintiffs seek a damage award.

**28.** The first proposed subclass would encompass those members of the class "who are recorded to have been, while incarcerated at the Bedford Hills Correctional Facility, (a) diagnosed as suffering from a psychotic mental illness, or (b) prescribed anti-psychotic medication, or (c) transferred to the facility Satellite Unit or to Central New York Psychiatric Center for in-patient care, or, while housed in Building 118, (d) were injurious to self or exhibited other symptoms of psychotic illness." (*See* Proposed Class Certification Order annexed to Plaintiffs' Memorandum of Law In Further Support of Plaintiffs' Motion for Modification of the Class Certification Order.)

**29.** The second proposed subclass would include all class members "who are not members of Subclass I and who have requested, received, or been referred for mental health services while incarcerated at the Bedford facility." (*Id.*)

**30.** Plaintiffs contend that the placement on SHU of the subclass I inmates was in itself a violation of their Eighth Amendment rights.

Certification under Rule 23(b)(3) requires satisfaction of two sets of criteria. The first group are embodied in Rule 23(a), which requires findings that the class is so numerous that joinder "is impracticable," that "there are questions of law or fact common to the class," that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and that the class representatives "will fairly and adequately protect the interests of the class." Since the Rule 23(a) standards are preconditions for any form of class certification, this Court's 1985 certification order necessarily reflects the appropriate findings. Absent some significant intervening event, those findings may be deemed to be the law of the case, and they reflect that plaintiffs have satisfied the requirements of Rule 23(a).

The one intervening event of consequence is that plaintiffs now seek to modify the class certification to encompass three sub-classes. Under Rule 23(c)(4), if the plaintiffs seek certification of subclasses, each must be treated as if it were a separate class and thus must be shown to satisfy the criteria of Rules 23(a) and (b). *See, e.g., Betts v. Reliable Collection Agency,* 659 F.2d 1000, 1005 (9th Cir.1981). Arguably, then, the findings contained in the prior certification order should be reexamined in light of this new posture. *But see American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781, 786–87 (9th Cir.1982). Nonetheless, even if such a *de novo* inquiry is appropriate in a case in which a class has previously been certified, it does not ultimately justify decertification here.

Defendants are unable to suggest any persuasive basis for rejecting the Court's prior Rule 23(a) findings at this stage. Indeed, the bulk of their argument is addressed to whether plaintiffs can meet the additional tests imposed by Rule 23(b)(3). The only Rule 23(a) argument of any consequence concerns numerosity and it should be rejected.

The plaintiffs estimate that approximately 250 individuals were housed in SHU from 1981 through August 1987. They further indicate that the first of the three subclasses contains between thirty and fifty inmates and the other two each encompass approximately one hundred additional individuals. These numbers are adequate to meet the numerosity requirement. *See* 3B *Moore's Federal Practice, supra,* at 23–140 to 145 & nn. 14–15; 1 H. Newberg, *Newberg on Class Actions* § 3.05 at 141–42 (2d Cir.1985).

In seeking to rebut these figures, defendants assert two principal arguments. First, they challenge the approximately six-year time period proposed by plaintiffs, contending that no violations subsequent to the filing of the complaint in 1984 should be considered. Second, they question whether the subclasses are as large as plaintiffs suggest. Neither argument is persuasive.

The appropriate time span of the class is a function of both the applicable statute of limitations and the effective date of the stipulation of settlement. Based upon these two guides, the relevant period could run from as early as July 31, 1981 through August 20, 1987.

This lawsuit was filed on July 31, 1984. Under Fed.R.Civ.P. 3, this filing constitutes commencement of the action for statute-of-limitations purposes. *See, e.g., West v. Conrail,* 481 U.S. 35, 107 S.Ct. 1538, 1541 & n. 4, 95 L.Ed.2d 32 (1987); *Gleason v. McBride,* 869 F.2d 688, 692–93 (2d Cir.1989); *Cohen v. Board of Education,* 536 F.Supp. 486, 493–95 (S.D.N.Y. 1982). Since the applicable statute of limitations under 42 U.S.C. § 1983 is three years in New York, *see, e.g., Owens v. Okure,* —— U.S. ——, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Gleason v. McBride, supra,* at 691, this action could encompass claims arising as early as July 31, 1981,[31] although plaintiffs seek a com-

---

**31.** Although the original complaint did not contain class action allegations, it did allege all of the basic facts material to the class claims and, by its request for injunctive relief, gave adequate notice that class-wide relief might well be merited. Under these circumstances the amended complaint may be deemed to relate back to the date of filing of the original pleading

mencement date that is one month later.[32]

With respect to the termination date for the class claims, the proposed cut-off of August 20, 1987 is entirely defensible. Plaintiffs alleged in their pleadings that the assertedly unconstitutional conduct was continuing and would continue indefinitely into the future unless enjoined. Thus their pleading adequately apprised defendants that the events in question were not deemed to terminate with the filing of the lawsuit. Similarly, discovery has encompassed this entire six-year time period. Furthermore, plaintiffs offer evidence reflecting the continuing nature of the alleged misconduct at least up to the date of approval of the settlement, which was August 20, 1987.[33]

Under these circumstances, there is no justification for cutting off the class claims as of 1984, as defendants seek. Although the number of potential class members has obviously increased since 1984 and although their claims encompass numerous alleged violations occurring since the filing of the complaint, this Court is not precluded as a matter of law from addressing these later events. *See, e.g., Smith v. Montgomery Country*, 117 F.R.D. 372, 376–77 (D.Md.1987); *Sanders v. Levy*, 20 Fed.R.Serv.2d 1218, 1221–22 (S.D.N.Y. 1975), *approved in Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 346 n. 6, 98 S.Ct. 2380, 2387 n. 6, 57 L.Ed.2d 253 (1978). *Cf. Woe v. Cuomo, supra*, 729 F.2d at 99–100, 107 (court certified class of persons "who are or who will be involuntarily civilly committed to New York State mental institutions."). Since the parties have manifested their understanding that this lawsuit encompassed all such events since 1984 —indeed, the 1986 Joint Pre–Trial Order so provided and the prior class certification order defined the class as encompassing inhabitants of SHU "to date"—there is equally no basis, as a matter of fairness, for foreclosing potentially sustainable claims for the entire period that has plainly been at issue in this case.[34]

Defendants' alternative argument with respect to numerosity is based on the contention that—at least insofar as the conditions of confinement claims are concerned —the number of affected inmates is far smaller than plaintiffs suggest because 117 purported class members were not on SHU when any of the unusual incidents listed in the prison's log took place. This argument is meritless. First, as previously noted, the conditions claim encompasses not merely unusual incidents of the type recorded in the log—such as attempted suicide, self-mutilation or arson—but also such allegedly continuing problems as deafening noise, accumulated filth, noxious odors, and fear of fires and assaults by demented inmates based on the repeated occurrence of such incidents. Second, there appears to be a substantial question as to the completeness of the prison log, and thus defendants can scarcely defeat the class certification based upon the questionable assumption that the log is complete and compre-

even though in effect it added a large number of inmates as potential beneficiaries of plaintiffs' claims. *See, e.g., Paskuly v. Marshall Field & Co.*, 646 F.2d 1210 (7th Cir.) (*per curiam*) (citing cases), *cert. denied*, 454 U.S. 863, 102 S.Ct. 321, 70 L.Ed.2d 162 (1981).

**32.** Defendants do not appear seriously to dispute this commencement date, although they do refer to the service of the complaint as the key date. This is incorrect. It is the filing of the complaint and not its service that constitutes the commencement of a suit that asserts federal claims. *See, e.g., West v. Conrail, supra*, 107 S.Ct. at 1541 & n. 4. The date of service is the relevant date under New York state law, C.P.L. R. § 203(b)(1), but state law applies in this respect only in diversity cases. *See, e.g., Walker v. Armco Steel Corp.*, 446 U.S. 740, 748–53, 100 S.Ct. 1978, 1984–86, 64 L.Ed.2d 659 (1980); *Morse v. Elmira Country Club*, 752 F.2d 35, 38 (2d Cir.1984).

**33.** Indeed, in his first status report, the neutral expert appointed by the Court pursuant to the settlement stipulation, Dr. Koson, reported continuing serious problems in provision of psychiatric treatment to SHU inmates. (*See* Exh. 25 at p. 1.)

**34.** Even if, as a technical matter, the court found it inappropriate to entertain claims not explicitly pled in the complaint, the appropriate remedy would be to permit plaintiffs to amend the complaint since such an amendment would neither surprise nor prejudice defendants. *See generally Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987).

hensive. Third, even if the class were reduced by this number of inmates it would be large enough to meet the Rule 23(a) numerosity requirement since all class members assert a "conditions of confinement" claim.

The remaining Rule 23(a) criteria are plainly met, just as they were when the Court issued its original certification order. There are "questions of law or fact common to the class," and indeed to each of the subclasses. With respect to the alleged failure to treat, these issues include, *inter alia*, the question of whether certain types of alleged diagnostic and treatment failings repeatedly encountered at Bedford SHU can constitute Eighth Amendment violations; whether placement of very seriously disturbed inmates on SHU can itself amount to an Eighth Amendment violation; the validity of defendants' assertion that the availability of brief consultations, medication and referral to Central New York for extreme cases constituted constitutionally adequate care; and the adequacy of their further argument that institutional limitations of space, facilities, and personnel, together with security concerns, prevented any better system for delivery of psychiatric care, thus negating any inference that defendants were deliberately indifferent to the medical needs of the first two subclasses. As for the conditions-of-confinement claims, common issues include whether the alleged conditions on SHU—including noise, smell, lack of hygiene, smoke and fire, and potentially traumatic unusual incidents—can amount to a violation of constitutional standards; the actual nature of conditions on SHU throughout the time period in question[35]; and the effect that such conditions are likely to have on a person confined in SHU. In addition, the class is bound together by a common issue posed by defendants' assertion of a qualified immunity defense—whether the policies and practices consistently enforced at Bedford Hills SHU during the relevant period can be said to have violated well-settled law.

The typicality of the claims of the representative plaintiffs and their adequacy as class representatives were upheld on the original class motion, and there is no reason to question these conclusions now. The named plaintiffs appear to allege injuries of a nature typical of the subclass that each represents and it is to be expected—particularly in view of their common representation by competent class counsel—that they can "fairly and adequately protect the interests of the class."

The more difficult questions are posed by the standards incorporated in Rule 23(b)(3), which have of course not been addressed previously since certification was granted under alternative provisions of Rule 23(b). The twofold test imposed by Rule 23(b)(3) asks whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

With respect to these two questions, Rule 23(b)(3) provides a specific but non-exclusive list of relevant considerations. These include "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action."

An assessment in terms of the criteria imposed by Rule 23(b)(3) suggests certain limitations on the propriety of a class approach to the plaintiffs' damage claims. Nonetheless, the desirability of retaining the class format for limited purposes and the availability to the court of various means for effectively dealing with the difficulties of adjudicating the remain-

---

**35.** Different people were on SHU at different times, but their potential entitlement to damages will depend on the severity of conditions over time for the period when they, and presumably a number of others, were on SHU.

ing claims on a class basis counsels against decertification. *See generally Woe v. Cuomo, supra,* 729 F.2d at 107 (emphasizing desirability of retaining class format if possible after original certification and noting array of procedural devices available to Court to deal flexibly with practical problems); 3B *Moore's Federal Practice, supra,* at 23–246 to 247 (Rule 23(b)(3) "was designed to permit class action treatment in actions on behalf of persons similarly situated when on balance it is convenient to do so.").

We begin with a review of the issues raised by plaintiffs' two sets of claims and an assessment of the degree to which they involve common issues of law or fact. We then turn to issues concerning manageability of these claims on a class-action basis and the fairness of such an approach.

The conditions of confinement claim is asserted on behalf of all class members. The conditions in question all spring from (a) an asserted policy of the State under which severely deranged inmates were placed in SHU, following commission of disciplinary infractions, without screening out those inmates incapable of non-disruptive behavior, and (b) the alleged practice of failing to give these and other distressed SHU inmates any meaningful treatment for mental problems.

It is readily apparent that the key factual questions uniting a conditions-of-confinement claim on behalf of inmates incarcerated in the same unit at the same time involve the nature and severity of the allegedly adverse conditions during the relevant time period. Was the noise continuing and deafening? Was there a constant and very strong noxious odor throughout the unit? Was the unit so filthy as to pose potential health hazards? Were the inmates on SHU frequently exposed to fires or assaults by disturbed inmates? Did the disturbed inmates engage in repeated efforts at suicide or self-mutilation and how did these efforts affect the other inmates, all of whom were locked in separate cells on the same small corridor for twenty-three hours each day?

The legal counterpart of these factual questions is the issue of whether and to what extent the existence of conditions of this severity—whether separately or in combination—constituted a violation of the inmates' constitutional rights. This generally phrased issue—common to all inmates who resided on SHU at the same time—in turn implicates a set of related issues, both legal and factual. First, the Court must determine whether the conditions were sufficiently bad to have fallen below constitutional minima. Second, an analysis of claims of this type must take into consideration the explanations by prison officials of why such conditions either served a penological purpose or were in large measure unavoidable under the circumstances and thus do not reflect deliberate indifference on the part of the jailers or their supervisors. Accordingly, defendants' explanation of the need not merely for SHU but for housing disruptive disturbed inmates on SHU and for doing so in the circumstances encountered at Bedford Hills must be addressed in disposing of all of the "conditions of confinement" claims. This in turn encompasses factual questions as to the nature of the security and disciplinary problems presented by the disturbed inmates, the availability of alternative methods of handling them and the specifics of how they were handled. It also encompasses a series of legal questions as to whether and why defendants' apparently consistent policies as to how to deal with such inmates were either justified or at least defensible exercises of prison administrators' recognized discretion.

Another set of intertwined factual and legal issues common to all "conditions" claims arises from defendants' assertion of a qualified immunity defense. This defense has already been articulated in one guise, under the assertion that it was not clearly established during the relevant period—or even now—that prison authorities were constitutionally obliged to undertake the host of special measures proposed by plaintiffs' counsel as possible means of adequately treating mentally disturbed in-

mates.[36] This issue is common to all class members and, in the wake of the District Court's March 31 decision, it may still have to be faced at trial. In any event, other defenses that will require common fact-finding are at least prefigured in the current motion. These include defenses based upon objective constraints of lack of funding and lack of space, as well as the individual defendants' assertions that the sophisticated handling of disturbed inmates was beyond their authority or their ability.

The foregoing suggests that common issues of fact and law do predominate over individual issues with respect to the "conditions of confinement" claim. In resisting the notion that these claims may be susceptible to some form of class treatment, defendants urge three principal arguments. First, they say, liability questions will vary from inmate to inmate even among inmates confined on SHU at the same time since conditions such as noise, smells and filth may have varied from one part of the unit to another. Second, they argue that at any one time no more than twelve inmates were on SHU and that conditions changed from day to day, and perhaps from hour to hour, thus requiring an individualized assessment of conditions unique to each inmate based upon when and where she was confined on SHU. Third, they appear to argue that damages for conditions of confinement must be based on the emotional or other injury to the individual as a result of the conditions, and that this necessitates an individualized inmate-by-inmate inquiry concerning the extent of injury resulting from any given set of unconstitutional conditions. All of these considerations, defendants contend, will require individual trials for each class member and this negates the value, and indeed the propriety, of a class-wide adjudication.

Defendants' arguments are ultimately unpersuasive. First, as defendants themselves note (*see* Defendants' Supplemental Rule 3(g) Statement at ¶ 1), the SHU unit is quite small, encompassing one passageway lined on each side by six cells, and there is simply no basis in the record to conclude that any of the challenged conditions had such a disparate impact on different parts of the unit as to make a noticeable difference. In any event, if the proof at trial demonstrates otherwise, the Court can make appropriate alterations in the class certification.

Second, although it is true that different inmates were confined to SHU at different times, this ultimately is not crucial. Generally speaking, the class members were on SHU for extended periods of time and were thus exposed to at least a broad sample of conditions on that unit. Moreover, there is no reason to conclude that conditions varied greatly over time. Although specific "unusual incidents" recorded in the prison log took place on only approximately twenty percent of the days within the relevant time period, we have noted that the challenged conditions do not principally concern merely the occurrence of such events [37], but rather involve conditions that plaintiffs propose to prove were more or less continuous, or at least so frequent as to be tantamount to continuous.

In any event, the difficulty posited by defendants in this respect is largely illusory. Even if an inmate was on SHU for only a short time, proof of long-standing inadequate conditions would be quite relevant to her claim that the conditions she encountered resulted from deliberate indifference. Thus, each class member has an interest in establishing the history of conditions on SHU throughout the period regardless of how limited a time she may have spent on SHU. Accordingly, at a joint trial the class plaintiffs would necessarily seek to prove the extent and severity of adverse conditions throughout the relevant time period. Once this record is made, the Court will be able to determine during which periods of time, if any, conditions on SHU were below constitutional minima, and only the inmates on SHU dur-

---

**36.** These include special housing, reallocation of existing funding and facilities, and avoidance of SHU placement for all severely disturbed inmates.

**37.** In any event, as noted, the comprehensiveness of the log itself is subject to serious dispute.

ing those periods will be deemed eligible for a damage award.[38] This type of proof of the nature and severity of conditions on SHU over an extended period is obviously best done in a single proceeding, and this argues strongly against decertification of the class.

Third, the task of damage determination is less imposing than defendants paint it. It is true that any class member could conceivably attempt, in a separate trial, to proffer a sophisticated medical or psychiatric case designed to demonstrate that the conditions in existence at the time of her stay on SHU caused her greater injury than one might otherwise infer based solely on the severity of those conditions. Given the realities of this case, however, that possibility is minimal, and real prejudice to more seriously injured class members can in any event be avoided without great difficulty.

In analyzing this problem, it bears emphasis that courts have been perfectly willing, based simply on proof of objective conditions in a prison, to award *per diem* damages to an inmate unconstitutionally confined. *See, e.g., Pino v. Dalsheim,* 605 F.Supp. 1305, 1319 (S.D.N.Y. 1984) (individual inmate); *Powell v. Ward,* 74 Civ. 4628 (CES), Findings and Recommendations at 4 (S.D.N.Y. July 6, 1983) (adopted Sept. 14, 1983) (class members); *Taylor v. Clement,* 433 F.Supp. 585, 588–89 (S.D.N.Y.1977) (discussing cases). *See also Sostre v. McGinnis, supra,* 442 F.2d at 205 n. 52. There is no reason to conclude that a similar procedure cannot be used here based upon the Court's class-wide findings that conditions on SHU for specified time periods (a) violated constitutional norms and (b) were of such severity as to merit the inference that inmates confined on those particular days were injured to an extent equivalent to a specific sum for each such day.

It is true that such an approach involves a degree of inexactitude, but that is entirely defensible. Compensation for pain and suffering—whether physical or emotional —inevitably involves substantial inexactitude, and thus it is not surprising that the federal courts have countenanced the use of arbitrary but efficient across-the-board measures of such suffering, even in non-class cases. *See, e.g., Moore–McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 587 (2d Cir.1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962) (assessing pain-and-suffering damages for eleven crewmen of capsized ship at $150.00 per hour regardless of individual circumstances and cause of death (if any), which varied from shark bite to exposure to drowning). In class cases, the courts have found still further justification for accepting some degree of imprecision in damage awards, even for economic loss, if substantial justice is done. *See, e.g., Stewart v. General Motors Corp.,* 542 F.2d 445, 452–53 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *United States v. United States Steel Corp.,* 520 F.2d 1043, 1056 (5th Cir.1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5th Cir.1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *F.W. Woolworth Co. v. NLRB,* 121 F.2d 658, 663 (2d Cir.1941); *Senter v. General Motors Corp.,* 383 F.Supp. 222, 229 (S.D.Ohio 1974), *aff'd,* 532 F.2d 511 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed. 2d 150 (1976). *See generally* 2 H. Newberg, *supra,* § 10.09 at 361–65.

Alternatively, the Court could establish a presumptive *per diem* award for each day during which conditions were of a given degree of unconstitutional severity and then permit both plaintiffs and defendants to seek a variation—either up or down—for specific class members based upon a showing of unique individual circumstances. Very few, if any, class members are likely to be the subject of such a separate proceeding, and in any event separate damage proceedings are not inconsistent with class

---

**38.** Determinations of who was on SHU on any given day can be readily made from prison records.

certification when the bulk of the issues, at least insofar as they concern liability, can be addressed in a single joint proceeding. *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Bresson v. Thomson McKinnon Securities*, 118 F.R.D. 339, 343 (S.D.N.Y.1988). *Cf., International Bhd. of Teamsters v. United States*, 431 U.S. 324, 371–72, 97 S.Ct. 1843, 1872–73, 52 L.Ed.2d 396 (1977).

As for defendants' expressed concern for possible unfairness to more grievously injured class members, it is doubtful that any noticeable prejudice would be caused by *per diem* awards. In any event, the foregoing procedures should adequately protect all class members. Moreover, the availability of the opt-out alternative for class members under Rule 23(b)(3) adds further assurance of fairness to the entire class. On balance, these procedures in conjunction with a continued class approach offer greater assurance of fairness to all parties than would a decertification of the class on the eve of trial.

■ Plaintiffs' second set of claims— alleging denial of care for serious medical needs—also raise a series of issues that can be addressed to a degree on a class-wide basis. Although these claims involve a greater need for individualized proof on a number of issues than do the "conditions of confinement" claims, retention of class certification for limited purposes is nonetheless justified.

■ We start with the recognition that the accepted standard for judging alleged denials of medical care contemplates an inquiry into the particular condition and needs of the individual plaintiff, the nature and extent of the alleged failure by defendants to address those needs, and the adverse effect of such failures on the plaintiff's condition. This mode of inquiry necessarily requires an examination at some stage of each eligible class member's medical history.

Plaintiffs appear to contend that an individualized inquiry of such dimension is not required because they are alleging the existence of "systemic" failures on the part of the prison in dealing with the medical needs of the disturbed inmates. Accordingly, they seem to argue, the case for a class-wide "failure to treat" claim can be made by using a sampling of case histories. Although this argument derives some arguable support from *Robert E. v. Lane,* 530 F.Supp. 930 (N.D.Ill.1981), which plaintiffs prominently cite, that case is plainly distinguishable and the proposition for which plaintiffs cite it is simply not sustainable.

The plaintiffs in *Robert E.* sought certification for an injunctive class under Rule 23(b)(2), and in that context it was reasonable for the Court to conclude that the plaintiffs could succeed on the basis of a limited series of case histories, which were designed to support what the Court characterized as a " 'structural suit' ... challenging the very 'bureaucratic dynamics' at work at [the prison] and not simply a collection of past, discrete, *Estelle*-like incidents." 530 F.Supp. at 939. As we have noted, "[a] series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." *Id.* (quoting *Bishop v. Stoneman, supra,* 508 F.2d at 1226). Alternatively, as the Court noted in *Robert E.,* "deliberate indifference can be reflected by 'systematic deficiencies in staffing, facilities or procedures [which] make unnecessary suffering inevitable....' " 530 F.Supp. at 940 (quoting *Todaro v. Ward, supra,* 565 F.2d at 52). Under either of these tests, the Court in *Robert E.* properly ruled that plaintiffs' factual allegations concerning specified case histories and systemic failures stated a claim and that proof of those allegations would "entitle them to declaratory and injunctive relief." 530 F.Supp. at 941.

■ Plaintiffs' proposed proof in this case is similar to that outlined in *Robert E.* Nonetheless, the fact that they are seeking damages as their central remedy places on them a somewhat greater burden

of proof. First, to the extent that their case rests on "systemic" inadequacies in procedures, staffing and facilities, they must still demonstrate that those individuals seeking damages on this basis were in fact suffering from a serious medical problem and that the systemic failures caused injury by denying them necessary care. Alternatively, to the extent that plaintiffs are claiming that defendants' individual medical decisions were repeatedly wrong and indeed unprofessional, they must again demonstrate a corresponding need for treatment on the part of each claimant and a causal link between the unprofessional decisions by defendants and the injury to the class member.

The foregoing indicates that, at least to a limited extent, plaintiffs must make an evidentiary showing with respect to each class member who seeks damages on a "failure to treat" claim. This, however, does not compel the conclusion that the class must be decertified, or that the "failure to treat" claims cannot be tried together with the "conditions of confinement" claims.

Plaintiffs' "failure to treat" claims raise a number of common legal and factual issues. To the extent that plaintiffs seek to recover based on a "systemic failure to treat" claim, each must demonstrate such "systemic" failures in the manner in which mental health care was provided at Bedford Hills during the relevant period and the Court must determine whether such failures did indeed occur and whether, as a matter of law, they were of such a dimension as to constitute potential violations of the constitutional rights of those inmates on whom they impacted. These broad historical issues plainly require common factual presentations. Furthermore, to the extent that an individual claimant contends that specific medical decisions of the defendants that affected here were so egregiously improper as to reflect deliberate indifference, she will necessarily seek to demonstrate an extended pattern of such erroneous decisions—whether concerning her or other class members—as a means of showing that the alleged errors constituted not merely simple negligence but rather deliberate indifference. *See, e.g., Doe v. New York City Dep't of Social Services, supra,* 649 F.2d at 145; *Todaro v. Ward, supra,* 565 F.2d at 52. *Cf. Fiacco v. City of Rennselaer,* 783 F.2d 319, 329–32 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987) (failure of defendant police commissioner to respond to complaints by individuals other than plaintiff indicates deliberate indifference in plaintiff's case). Such an effort to prove the defendants' indifference will necessarily require each class member to rely on the same body of evidence for the purpose of persuading the court that when the responsible authorities erred, it occurred for reasons other than honest error. This too adds a large body of common issues of both fact and law to the "failure to treat" case, thus further enhancing the appropriateness of class treatment. *Cf. Craik v. Minnesota State University Board,* 731 F.2d 465, 471–72, 483–84 (8th Cir.1984) (in finding intent to discriminate against individual plaintiff, court can look to evidence of conduct with respect to other class members). *Accord, Coates v. Johnson & Johnson,* 756 F.2d 524, 533 (7th Cir.1985).

Additional common issues of law and fact are raised by defendants' asserted defenses. Defendants' assertion of a qualified immunity defense based on a lack of settled law requiring them to provide more extensive care raises common issues of fact, concerning what level of care defendants did provide and what alternatives were available, and common issues of law, concerning the applicable legal standards. In addition, as noted in connection with the "conditions of confinement" claim, defendants apparently propose to rebut the claim of deliberate indifference in the provision of medical care by offering evidence of institutional limitations on their ability to provide better services and proof of their lack of responsibility for or authority over the handling of such matters at the prison. Again, these assertions—which raise a series of legal and factual issues as to what was done and what could have been done and by whom—are common to all of the "failure to treat" claimants.

The appropriateness of addressing the "failure to treat" claims in a class setting is further enhanced by two considerations. First, these claims are intimately linked to the "conditions of confinement" claims, which, as noted, reflect a predominance of common legal and factual issues. Indeed, the central proof on the "conditions of confinement" claims must necessarily involve evidence of how the State dealt with the mentally disordered inmates who were sent for extended periods to SHU. Accordingly, a joint trial, to the extent feasible, will prove far more efficient than parcelling out the "failure to treat" claims to a multiplicity of separate proceedings.

Second, the unavoidable individualized proof that must be offered with respect to all class members asserting "failure to treat" claims—that is, members of the first two subclasses—can probably be accomplished quite efficiently in one proceeding. It appears that the plaintiffs' proof on this matter is largely going to come through the testimony of plaintiffs' psychiatric experts, who will have reviewed the pertinent medical and other files of the disturbed inmates, and can testify—based on their review and possibly on inmate interviews—concerning the class members' mental status and need for care, the adequacy of the care provided, whether the records indicate a systemic failure in this regard or errors of such magnitude as to justify a conclusion that challenged decisions reflected a failure to exercise professional judgment, and whether and to what extent the inmate was injured by these failings. We may anticipate that defendants' case will involve some amount of similar psychiatric testimony, together with the evidence concerning institutional limitations and the extent of the defendants' efforts and authority to improve conditions.

Although such a proceeding would probably not be brief, it is surely manageable, and readily complements the necessary fact-finding inquiry with respect to plaintiffs' "conditions of confinement" claims. In short, the "failure to treat" claims reflect a sufficient predominance of common issues of law and fact, particularly when viewed in the context of the entire potentially triable case, to justify a finding of compliance with the commonality requirement of Rule 23(b)(3).

The foregoing analysis also reflects that class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy." The numerous members of the class have no discernible interest "in individually controlling the prosecution ... of separate actions." Fed. R.Civ.P. 23(b)(3)(A). Indeed, in view of the fact that many or most are still incarcerated, are probably without resources, and are lacking in either the knowledge or mental stability to arrange for separate litigation, there is no reason whatever to have these damage claims separately litigated. There is also no profusion of other lawsuits on the same subject. Indeed, it appears that the potential claims of the Bedford SHU inmates are all included in this forum. *See* Fed.R.Civ.P. 23(b)(3)(B). Moreover, in view of the common issues, the disabilities under which the plaintiff class members are laboring, and the location of the most relevant evidence, the concentration of these claims in one forum is plainly desirable. *See* Fed.R.Civ.P. 23(b)(3)(C).

As for the management of the class action, for the reasons already noted, it should not be an insuperable problem. Indeed, discovery is nearly complete and the case can be tried on a consolidated basis. Furthermore, I note that if it appears that proof of all "failure to treat" claims in one hearing before the District Judge may be inconsistent with the Court's busy schedule, some or all of the individualized evidence of failure to treat could be heard on reference by a special master or magistrate, thus further reducing any burden on the Court.

In opposing retention of a class format, defendants offer several additional arguments addressed to the fairness of this approach and the asserted existence of conflicts of interest among the class members. None compels decertification.

Defendants assert that there are irremediable conflicts between class members because some of the members are

claiming violation of their constitutional rights as a result of the actions of other members of the class. This argument is misconceived. All of the class members are asserting violations of their constitutional rights by the *defendants,* whose policies and practices are said to have caused them injury. The fact that several of the assertedly deranged inmates may have been presumably unwitting agents for creating some of the conditions in question does not demonstrate a legally cognizable conflict between them and the remaining class members. All are asserting that they have been injured by exposure to conditions that were the inevitable result of gross failings in the State's system for dealing with mentally disordered disruptive inmates. There is no reason why all of these claims cannot be dealt with in one proceeding.[39]

■ Alternatively defendants assert, albeit without citation of legal authority, that the disruptive mentally disordered inmates cannot recover on a "conditions of confinement" claim if they were in fact directly responsible for those conditions. The question of "responsibility" in this context is a subtle one, but in any event need not be confronted at this stage. The evidence at trial will indicate whether and to what extent the limited number of disruptive inmates may have been sufficiently in control of their own actions to suggest that they were, in any meaningful sense, "responsible" for them, and the evidence will further indicate whether and to what extent the actions of these specific inmates caused the assertedly unconstitutional conditions about which they and all other class member inmates are complaining. Based on that trial record and on such legal argument as the parties may care to offer, the Court can determine whether these inmates are or are not barred from recovering on a "conditions" claim.[40]

This issue does not affect the class question at this stage because plaintiffs' proposed alignment of subclasses places all such extremely disturbed inmates in the first subclass. Accordingly, if the Court were ultimately to conclude that the disruptive inmates should not recover on a conditions claim and that all members of subclass I were disruptive, it could simply limit liability on that claim to the other two subclasses. Alternatively, since the evidence will presumably identify which inmates were the source of the disruption, the Court could simply exclude them from eligibility for a damage award.

**B. The Scope of the Class**

■ As previously indicated, the parties are in dispute concerning the extent of the class. Apart from the previously discussed question of its temporal scope,[41] there is now a dispute concerning whether it should encompass inmates housed in a wing of Building 118 that was not ordinarily used for SHU. In their sur-reply memorandumon these motions, plaintiffs urge for the first time that the prior class certification order should be read to encompass not merely SHU, but the entire Building 118, which also houses a comparable cell block that is utilized for protective custody.

Plaintiffs' effort to expand the class is misguided. The focus of the complaint and of the ultimate injunctive settlement was on the alleged harm being done by virtue of prison policies concerning treatment of mentally disturbed inmates whose disruptive behavior led to their placement on SHU. It was not directed to the manner in which Bedford Hills ran its protective custody unit.

The distinction between the two units is significant. Disruptive inmates ordinarily arrived in Building 118 because of disciplinary infractions, and the resulting sanction involved placement in SHU, with attendant substantial loss of freedom, including par-

---

**39.** Even if a relevant divergent interest between the disruptive and non-disruptive inmates could be discerned, it is adequately addressed by the definition of a separate subclass containing the disruptive inmates.

**40.** Defendants' argument does not affect plaintiffs' "failure to treat" claim.

**41.** *See* pp. 553–54, *supra.*

ticularly being in keeplock status for 23 hours per day and living on the SHU unit.[42] It was the placement of disturbed inmates on this unit and the alleged inadequacy of their treatment there that led to plaintiffs' claims of constitutional violations for all SHU residents.

In contrast, inmates were placed in protective custody for entirely different reasons and were housed on a separate cell block, albeit in the same building as the SHU unit and adjacent to that unit. There is no suggestion in the record that these inmates were mentally disturbed or, if so, were denied treatment. There is also significant reason to doubt that they were exposed to the same or comparable unconstitutional conditions as the SHU inmates because of their proximity to the SHU unit. Moreover, they were placed on an entirely different regime that did not involve a daily twenty-three-hour confinement in their cells and other limitations of the type imposed on the SHU inmates.

The difference between these two groups is only underscored by the candid concession of plaintiffs' counsel at oral argument that if the inmates housed in protective custody were included in the class, the Court would probably have to define a fourth sub-class. (Feb. 17, 1989 Tr. at 139–40.) Plaintiffs never sought such a certification, presumably because they recognized that the factual premise of their suit did not encompass conditions or medical care on the protective custody unit.[43]

The principal asserted basis for plaintiffs' argument on this point is the language of the original class certification order, which refers to Building 118. In context, however, it is perfectly obvious that the class as defined is limited to SHU inmates, since the order refers to "every NYS prisoner who resided on the disciplinary segregation Special Housing Unit, Unit 118[,] Bedford Hills Correctional Facil-

ity...." This plain wording encompasses only those inmates assigned to SHU, a definition that is perfectly consistent with the claims that plaintiffs have asserted in this case. In sum, the class should be defined to encompass all New York State prisoners who resided on the Special Housing Unit in Building 118, Bedford Hills Correctional Center, from August 31, 1981 through August 20, 1987.[44]

### C. The Type of Certification

There is no question that since plaintiffs now seek principally damages, the class should be certified under Rule 23(b)(3). Plaintiffs, however, request an alternative certification of a mandatory class under Rule 23(b)(1)(B) with respect to two issues—the prayer for an award of punitive damages and the claim for compensatory and punitive damages against defendant Klug. The underlying theory with respect to punitive damages is that if some class members opted out under Rule 23(b)(3), they might be disadvantaged if they sued separately at a later time since significant punitive damages might be awarded in this lawsuit on behalf of the class and might exhaust or substantially diminish whatever funds were available to pay judgments against the individual defendants. This could have two consequences—first, the defendants might lack the funds to pay any later judgment, and, second, a trier of fact in a later trial could minimize or refuse to make a punitive damage award because the defendants by that time would have such minimal assets as a result of the class judgment. Under these circumstances, plaintiffs argue, it is more equitable to require that all class members' punitive damage claims be tried together in one proceeding. As for defendant Klug, plaintiffs appear to contend that a significant damage award against him in this case might prejudice the ability of opt-out liti-

---

**42.** The only exception is that in a few rare instances when the SHU cells were all occupied, a new arrival assigned to SHU had to be placed in a comparable cell on the other unit in Building 118.

**43.** Plaintiffs also never included a proposed class representative who was a non-SHU inmate housed in protective custody.

**44.** It does not appear that exclusion of protective custody inmates from the class would affect the numerosity issue.

gants to recover against him in a later proceeding.

■ There is some case law authority for the legal theory espoused by plaintiffs in the context of mass tort litigation. *See, e.g., In re Agent Orange Products Liability Litigation,* 100 F.R.D. 718, 726–28 (E.D. N.Y.1983), *mandamus denied sub nom. In re Diamond Shamrock Chemicals Co.,* 725 F.2d 858 (2d Cir.), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). It has also been utilized in conjunction with a settlement of prisoner class claims. *See In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703, 710–13 (E.D.Mich.1985) (citing cases). The difficulty with the proposed application of this approach here, however, is that plaintiffs have not established the factual predicate for its application, which involves a determination of a likelihood or substantial prospect that an award in the class suit will exhaust whatever fund is available to satisfy later opt-out plaintiffs. *See, e.g., In re Bendectin Products Liability Litigation,* 749 F.2d 300, 305–06 (6th Cir.1984), *cert. denied,* —— U.S. ——, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).

■ In seeking Rule 23(b)(1)(B) certification, plaintiffs offer nothing more than *ipse dixit* assertion that such a certification is needed. This is inadequate to sustain their application or to require an evidentiary hearing. *Cf. In re Agent Orange Product Liability Litigation, supra,* 100 F.R.D. at 727 (hearing held by special master). At present there is reason to doubt (a) that any class members will opt out or (b) that any punitive damages will be awarded. In any event, there is no evidence concerning the extent of available funds, and plaintiffs have not suggested that they have any information relevant to this inquiry. Moreover, with respect to defendant Klug, it may well be the case that in the event of an adverse judgment for compensatory damages, the State of New York will in fact be the ultimate source of payment, in which case no fund exhaustion problem need be faced. (*See* N.Y. Public Officers Law § 17(3)(a).)[45] Whether that would be the case is unclear on the present record, but as the proponents of the mandatory class certification, plaintiffs bear a burden of proof that they have not attempted to satisfy.

In sum, I conclude that the Rule 23(b)(1)(B) certification proposed by plaintiffs has not been adequately justified on the current record. Accordingly their application should be denied albeit without prejudice to reconsideration if the circumstances warrant it.[46]

### D. Definition of Subclasses

■ Defendants also argue that plaintiffs' definition of the subclasses is lacking in sufficient specificity and does not serve the purposes for which they have been defined. This appears not to be the case, but in any event if the evidence at trial suggests otherwise, the Court can then alter the precise definition of those subclasses in such manner as it deems appropriate.

The first subclass is specifically keyed to entries in the records maintained by the State. Moreover, the terminology utilized is sufficiently precise to permit a reasonably efficient determination of which inmates belong to that subclass. As for the question of whether all of these individuals had a serious medical need at the time of their stay on SHU, that is an allegation of fact to be proven or disproven at trial.

The second subclass is keyed to requests or referrals for attention by OHM. Although defendants argue that some or all of the inmates who fit this definition may not have had a serious medical need while on SHU, this again is an issue of fact for trial. Since, as indicated above, plaintiffs must prove the predicate facts for "failure to treat" liability with respect to each claimant, the definition of this subclass of

---

**45.** The statute does not authorize reimbursement of punitive damages. (*See* N.Y. Public Officers Law § 17(3)(c).)

**46.** I note that the parties have advised that discovery on this matter has been deferred by the District Court. If the Court finds plaintiffs' application worthy of further consideration, it may wish to reconsider that prior ruling.

inmates who may have been denied needed treatment will not prejudice defendants.[47]

The third subclass consists of all other residents of SHU during the relevant period, and is intended to include all inmates who assert only a "conditions of confinement" claim. As such, its definition does not implicate any significent class problems, and it appears not to be a subject of controversy between the parties.

### E. *The Timing of Class Notice*

An additional question is presented by plaintiffs' request that the notice required by Rule 23(b)(3) be deferred until determination of liability. This is neither feasible nor appropriate in this case. As the prior discussion has suggested, liability and damages are only partly severable and, except to the extent indicated, a joint trial is likely to be the most efficient procedure. In any event, notice will not be burdensome since the State can, and should be ordered to, provide plaintiffs' counsel a list of last-known addresses for those class members not still at Bedford Hills.[48]

### CONCLUSION

For the reasons stated, I recommend that defendants' motion for summary judgment on the merits be denied, that their motion to dismiss under the Eleventh Amendment be denied except with respect to defendant Klug's cross-claim, and that their motion for decertification of the class be denied.[49] I further recommend that the class certification be modified to encompass, under Rule 23(b)(3), all inmates housed on SHU, Building 118, at Bedford Hills Correctional Facility from August 31, 1981 through August 27, 1987, and that the class be divided into three subclasses. Subclass I would

include "those members of the class as defined above who are recorded [in the files of DOCS or OMH] to have been, while incarcerated at the Bedford Hills Correctional Facility, (a) diagnosed as suffering from a psychotic mental illness, or (b) prescribed anti-psychotic medication, or (c) transferred from the facility Satellite Unit or to Central New York Psychiatric Center for in-patient care, or (d) while housed in [SHU], injurious to self or exhibiting other symptoms of psychiatric illness." (*See* Proposed Order annexed to Plaintiffs' Memorandum of Law in Further Support of Plaintiffs' Motion for Modification of The Class Certification Order.) Subclass II would include "those members of the class as above defined who are not members of Subclass I and who have requested, received or been referred for mental health services while incarcerated at the Bedford Hills Correctional Facility." (*Id.*) Subclass III would include all remaining members of the class—that is, those who are not members of the first two subclasses and seek damages solely as a result of the conditions of their confinement on SHU.

Pursuant to Rule 7 of the Rules of Proceedings Before a U.S. Magistrate, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Leonard B. Sand, Room 626, and to the chambers of the undersigned, Room 503. Failure to file timely objections may constitute a waiver of those objections. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988).

---

**47.** As noted, the principal reason for separating subclass II from subclass I is that members of subclass I contend that their placement on SHU was itself a violation of the Eighth Amendment right to treatment.

**48.** The parties are also in dispute concerning certain details of the notice to be sent to class members. Plaintiffs' proposed notice is annexed to their Memorandum of Law in Further Support of Plaintiffs' Motion for Modification, and was criticized by defendants' counsel at oral argument. These details are more properly ad-

dressed when the Court determines whether to modify the class certification and, if so, how to define the class.

**49.** In recent correspondence to the District Court, the parties have alluded to an open question concerning the status of the parallel *Evans* litigation. The parties' arguments on the current motion have not specifically addressed this matter and I therefore make no recommendation with respect to it at this time.

DATED: New York, New York
April 21, 1989
RESPECTFULLY SUB-
MITTED,
/s/ Michael H. Dolinger
MICHAEL H. DOLINGER
UNITED STATES MAGIS-
TRATE